FILED
United States Court of Appeals
Tenth Circuit

July 17, 2013

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

P. DAVID NEWSOME, JR.,
Liquidating Trustee of Mahalo Energy
(USA), Inc.,

Plaintiff-Appellant,

v.

WILLIAM GALLACHER, DUNCAN
CHISHOLM, GARY H. DUNDAS,
JEFF G. LAWSON, JAMES BURNS,
KEVIN WOLFE, DAVID E.
BUTLER, and BURNET,
DUCKWORTH AND PALMER, LLP,

Defendants-Appellees.

No. 12-5068

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
(D.C. NO. 4:11-CV-00140-GKF-PJC)**

---

Ali M. M. Mojdehi, Cooley LLP, San Diego, California (Janet D. Gertz, Cooley
LLP, San Diego, California, and William B. Federman and Joshua D. Wells,
Federman & Sherwood, Oklahoma City, Oklahoma, with him on the briefs) for
Appellant.

Craig Fitzgerald, GableGotwals, and Paula J. Quillin, Franden, Woodard, Farris,
Quillin + Goodnight (John Henry Rule, GableGotwals, and Joseph R. Farris,
Franden, Woodard, Farris, Quillin + Goodnight, with them on the brief) Tulsa,
Oklahoma, for Appellees.

---

Before **TYMKOVICH**, **SEYMOUR**, and **GORSUCH**, Circuit Judges.

**TYMKOVICH**, Circuit Judge.

This case requires us to answer a classic personal jurisdiction question—who was injured, and where? The answer to that question will determine whether the representative of a Canadian-owned Delaware corporation operating exclusively in Oklahoma may sue the corporation's Canadian officers and directors in Oklahoma.

To bring a suit, the plaintiff must show the defendants are subject to personal jurisdiction in Oklahoma. The Constitution allows for personal jurisdiction only when the requirements of due process are met. Here we conclude the Constitution allows this lawsuit to proceed in Oklahoma.

Plaintiff David Newsome is a litigation trustee appointed by the Bankruptcy Court for the Eastern District of Oklahoma to administer the legal claims of Mahalo Energy (USA), Inc. Newsome brought suit in the Northern District of Oklahoma alleging various breaches of fiduciary duty against the corporation's former directors and officers, other closely affiliated persons, and a law firm that provided legal services to the corporation. All defendants are Canadian citizens or entities domiciled in Alberta. The defendants moved to dismiss for lack of personal jurisdiction and the district court granted that motion.

We conclude the district court erred in part. Specifically, we hold the individual defendants (every defendant but the law firm) cultivated sufficient

contacts with Oklahoma to justify suit there. We also hold that the fiduciary shield doctrine—under which personal jurisdiction may not attach to a corporate agent by virtue of actions the agent takes solely on the corporation's behalf—does not apply here. We therefore reverse as to the individual defendants and remand for further proceedings.

As for the law firm, however, we affirm. Given the law firm's out-of-state character and that it performed all of its relevant services out-of-state on an out-of-state transaction, it did not cultivate sufficient contacts with Oklahoma to justify personal jurisdiction there. The district court therefore correctly dismissed the law firm.

# I. Background

## A. *Mahalo USA and Mahalo Canada*

Mahalo Energy (USA), Inc. is a Delaware corporation which, before its bankruptcy, operated exclusively in Oklahoma. Mahalo USA was in the business of exploring for and producing natural gas. Mahalo USA had a field office, employees, equipment, and real estate interests in Oklahoma.

Mahalo USA is wholly owned by Mahalo Energy Ltd., a Canadian corporation we will refer to as "Mahalo Canada." The basic thrust of this lawsuit is that Mahalo Canada's directors (some of whom were also directors or officers of Mahalo USA) conspired to maximize their own profits by shifting unsustainable debt to Mahalo USA. This course of action began in 2006, when

Mahalo Canada acquired another company and assumed its debt. Mahalo Canada then transferred all of that debt to Mahalo USA while keeping the equity. Mahalo Canada also encumbered Mahalo USA's assets as partial security for Mahalo Canada's $50 million revolving line of credit. Finally, Mahalo Canada sold some of its Canadian assets to an investment vehicle in which most Mahalo Canada directors were invested, leaving Mahalo USA's encumbered assets as the primary security for Mahalo Canada's credit line.

### B. The Ableco Transaction

Newsome claims things got worse for Mahalo USA in July 2008, when Mahalo Canada caused Mahalo USA to pay off Mahalo Canada's line of credit and enter into a new $105 million line of credit with a company called Ableco. Ableco supposedly has a "loan to own" reputation (*i.e.*, loaning to failing companies with hopes of seizing assets upon default). Newsome says that Mahalo USA's directors and officers knew the company could never service the new $105 million debt, but entered into the Ableco transaction anyway because it maximized their equity in Mahalo Canada. Mahalo USA defaulted on the Ableco loan about three weeks after closing.

Apparently Mahalo USA soon received an offer from a third party to purchase Mahalo USA's assets for an amount that would pay off its debts. But Mahalo Canada's directors scuttled the deal because the offered purchase price

-4-

was barely more than Mahalo USA's outstanding debt, meaning the equity holders (*i.e.*, defendants) would see little or no profit.

After rejecting the purchase offer, Mahalo Canada caused Mahalo USA to sign an amendment with Ableco that increased the credit line and the fees charged. Mahalo USA still could not pay off its debts and filed for bankruptcy protection in the Eastern District of Oklahoma in May 2009.

### C. *The Nature of Newsome's Lawsuit*

After receiving his charge to administer Mahalo USA's legal claims for the benefit of its creditors, Newsome brought suit against seven Canadian citizens and a Canadian law firm, all domiciled in Alberta. The individual defendants—James Burns, David Butler, Duncan Chisholm, Gary Dundas, William Gallacher, Jeff Lawson, and Kevin Wolfe—generally had overlapping roles as directors or officers (or both) at Mahalo Canada or Mahalo USA (or both). All have equity stakes in Mahalo Canada. Jeff Lawson was also a partner at the law firm (Burnet, Duckworth & Palmer LLP), to which both Mahalo entities frequently turned for legal services. The law firm itself had no equity stake in Mahalo Canada.

Newsome claims all defendants breached their fiduciary duties to Mahalo USA with respect to the debt transactions that sank the company. To the extent a defendant did not have a fiduciary duty toward Mahalo USA, Newsome claims the defendant aided and abetted a breach of fiduciary duty. As to the law firm, he claims it represented both Mahalo Canada and Mahalo USA but had an

irreconcilable conflict of interest because Mahalo Canada directed the firm to take actions that favored Mahalo Canada at Mahalo USA's expense. Newsome also asserts that the law firm aided and abetted the individual defendants' breaches of fiduciary duty.

### D. *Defendants' Contacts with Oklahoma*

Every alleged breach originated in Alberta without any contact with Oklahoma. As officers of Mahalo USA, Chisholm and Burns both traveled to Oklahoma frequently to check up on Mahalo USA's physical operations, but only two of those trips—taken by Burns in January 2009—have any conceivable connection to the debt transactions that gave rise to this lawsuit. Those two trips involved presentations to potential purchasers of Mahalo USA's assets.

The other individual defendants had significantly fewer travels to Oklahoma. Dundas made one trip in 2005 (before the period relevant to this lawsuit) in his dual capacity as a director of Mahalo Canada and Mahalo USA. Gallacher traveled with Dundas on the same trip as a director of Mahalo Canada, but otherwise never traveled to Oklahoma on Mahalo business. Butler and Lawson have never traveled to Oklahoma on Mahalo business. Wolfe has never set foot in Oklahoma for any reason. None of the individual defendants have ever owned or leased real property in Oklahoma, held bank accounts in Oklahoma, appointed agents in Oklahoma, filed suit in Oklahoma, or registered to do business in Oklahoma.

Similarly, the law firm has very few Oklahoma connections. It is not licensed to practice law or otherwise do business in Oklahoma, does not advertise in Oklahoma, has no offices or other real property in Oklahoma, has no bank accounts in Oklahoma, and does not pay taxes in Oklahoma. In terms of its actions toward Mahalo USA, the law firm performed all legal services relevant to this lawsuit in Canada.

## II. Analysis

### A. Personal Jurisdiction Generally

We begin with an overview of personal jurisdiction, in particular the requirements of state and federal law in assessing the power of courts to assert jurisdiction over these Canadian defendants.

Federal courts may exercise personal jurisdiction over a defendant "who is subject to the jurisdiction of a [state] court . . . in the state where the [federal] court is located." Fed. R. Civ. P. 4(k)(1)(A). This requires us to focus first on state law, and particularly, the relevant state's long-arm statute. That statute establishes the extent to which the state intends its courts to exercise jurisdiction over nonresidents. Thus, any personal jurisdiction analysis must begin there.

The Oklahoma legislature has authorized Oklahoma courts to "exercise jurisdiction on any basis consistent with the Constitution of this state and the Constitution of the United States." Okla. Stat. Ann., tit. 12, § 2004(F). No party has argued any state constitutional objection, so we turn to the only relevant

inquiry for this case—whether the United States Constitution places any limits on Oklahoma's ability to exercise jurisdiction.

"The Supreme Court has held that, to exercise jurisdiction in harmony with due process, defendants must have 'minimum contacts' with the forum state, such that having to defend a lawsuit there would not 'offend traditional notions of fair play and substantial justice.'" *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). As a general matter, then, if a nonresident party has "continuous and systematic general business contacts with the forum state," general personal jurisdiction might exist. *Trujillo v. Williams*, 465 F.3d 1210, 1218 n.7 (10th Cir. 2006) (internal quotation marks omitted). General personal jurisdiction over a party permits the forum to resolve any dispute involving that party, not just the dispute at issue. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414–16 (1984). Newsome has not argued that any defendant has sufficiently systematic contacts with Oklahoma to warrant general personal jurisdiction there. Thus, we focus on specific personal jurisdiction—*i.e.*, jurisdiction specific to this dispute—and its attendant "minimum contacts" test.

"Because a state's sovereignty is territorial in nature, a defendant's contacts with the forum state must be sufficient such that, notwithstanding its lack of physical presence in the state, the state's exercise of sovereignty over it can be described as fair and just." *Dudnikov*, 514 F.3d at 1070. To implement this

principle, courts typically make three inquires: (1) whether the defendant purposefully directed its activities at residents of the forum state; (2) whether the plaintiff's injury arose from those purposefully directed activities; and (3) whether exercising jurisdiction would offend traditional notions of fair play and substantial justice. *Id.* "We review de novo questions of personal jurisdiction." *ClearOne Commc'ns, Inc. v. Bowers*, 651 F.3d 1200, 1214 (10th Cir. 2011).

### B. Personal Jurisdiction for the Individual Defendants[1]

#### 1. Purposeful Direction

In tort-based lawsuits such as this one, "purposeful direction" has three elements: "(a) an intentional action . . . that was (b) expressly aimed at the forum state . . . with (c) knowledge that the brunt of the injury would be felt in the forum state . . . ." *Dudnikov*, 514 F.3d at 1072. To resolve the purposeful direction inquiry in this case, however, we must settle certain preliminary questions about whether Newsome can attribute the acts of the individual defendants to each other through a conspiracy allegation, and whether Mahalo USA is really the injured party.

---

[1] The individual defendants comprise Burns, Butler, Chisholm, Dundas, Gallacher, Lawson (in his capacity as a Mahalo Canada director), and Wolfe.

### a. The Conspiracy Question

Purposeful direction analyses traditionally tend to focus on a defendant's contacts such as travels to the forum, communications with forum residents, the course of business dealings with forum residents, and so forth. Newsome, however, does not attempt to establish such traditional contacts between these defendants and the State of Oklahoma. Newsome instead accuses the individual defendants of conspiring to maximize their personal gain at Mahalo USA's expense, arguing that personal jurisdiction can be obtained over all of them through the conspiracy.[2]

As authority for this proposition, Newsome cites *Melea, Ltd. v. Jawer SA*, where we stated that "[t]he existence of a conspiracy and [overt] acts of a co-conspirator within the forum may, in some cases, subject another co-conspirator to the forum's jurisdiction." 511 F.3d 1060, 1069 (10th Cir. 2007). But *Melea*, by its terms, requires at least one of the conspirators to have pursued the conspiracy within the forum state. *Cf. id*. at 1070 ("a co-conspirator's presence within the forum might reasonably create the 'minimum

---

[2] The district court struck some of the evidence Newsome submitted in support of personal jurisdiction, and Newsome challenges that ruling here. But if the district court committed error (which we do not decide), then it was harmless. As to evidence concerning the individual defendants, the district court may have struck Newsome's supporting materials but it took Newsome's assertions at face value—indeed, it reprinted them verbatim. *See* App. 1775–76. The district court did not do likewise with the evidence concerning the law firm, but having reviewed that evidence ourselves, we conclude the district court nonetheless reached the right result in dismissing the firm. *See infra* Part II.C.

contacts' with the forum necessary to exercise jurisdiction over another co-conspirator if the conspiracy is directed towards the forum, or substantial steps in furtherance of the conspiracy are taken in the forum"). Newsome makes no such allegation against any of the individual defendants. *Melea* therefore does not help us here.

This case, instead, presents an unusual situation: a conspiracy that takes place entirely outside of the forum, but with the conspirators' knowledge that the forum would bear the brunt of the conspiracy's harmful effects. Outside of the conspiracy context, this sort of situation would pose no doctrinal problem. In *Calder v. Jones*, for instance, the Supreme Court permitted California to exercise jurisdiction over parties—in that case a newspaper editor and a reporter—acting entirely from Florida to cause injuries in California. 465 U.S. 783, 789–91 (1984). The question is whether the result should be different if a conspiracy is involved.

We recognize parties could potentially stretch the conspiracy cause of action to subvert the due process principles that govern personal jurisdiction. *See generally* Ann Althouse, *The Use of Conspiracy Theory to Establish In Personam Jurisdiction: A Due Process Analysis*, 52 Fordham L. Rev. 234 (1983). We also acknowledge that personal jurisdiction requirements "must be met as to each defendant." *Rush v. Savchuk*, 444 U.S. 320, 332 (1980). But we cannot dismiss out of hand the jurisdictional theory Newsome presents. If three Kansans

conspired to fire a cannonball into Oklahoma, we do not believe the Constitution would foreclose Oklahoma courts from exercising jurisdiction over the conspirators simply because they confined themselves to Kansas.

Nonetheless, we need not decide the precise standard to apply to this circumstance. Newsome treats the individual defendants as identical in all material respects. As he alleges, all reside in Alberta, all knew that Mahalo USA operated exclusively in Oklahoma, all had a fiduciary duty to Mahalo USA or aided and abetted someone who did, and all collectively took intentional actions that caused breaches of fiduciary duties owed to Mahalo USA. If true, there is no theoretical problem with analyzing these allegations as applying to them both individually and as a group.

Defendants counter by asserting generically that they should not be treated as a group, but their only specific argument in that regard is that the law firm differs from the group as a whole. We agree and will analyze the law firm separately. *See infra* Part II.C. But defendants do not explain why any other defendant differs from the group for personal jurisdiction purposes.

Accordingly, we accept Newsome's contention that the individual defendants are materially identical for personal jurisdiction purposes.

### b. The Injured Party

Our analysis of purposeful direction also requires us to examine the claimed injuries giving rise to the lawsuit in the forum, which inevitably leads us to the question, "Who was injured, and where?" In this case, the answer turns out to be somewhat complicated.

The named plaintiff, Newsome, is simply a court-appointed trustee. The bankruptcy court, however, gave Newsome charge over Mahalo USA's legal claims, instructing him to administer them "for the benefit of creditors." App. 11. This connection to the creditors is important. In Delaware,[3] if a wholly-owned subsidiary is solvent, the subsidiary's directors owe their fiduciary duties to the parent and its shareholders. *Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1174 (Del. 1988). Thus, loading debt on a solvent subsidiary to maximize the parent's value is not a breach of fiduciary duty to the subsidiary. *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 192 (Del. Ch. 2006).

Things change, however, when the subsidiary becomes insolvent. At that point, the subsidiary's "creditors take the place of the shareholders as the residual beneficiaries of any increase in value," and the director therefore owes fiduciary duties to the creditors as well as the corporation. *N. Am. Catholic Educ.*

---

[3] The parties agree that Delaware law governs at least the Mahalo USA directors' duties.

*Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007). Thus, if Newsome has a prima facie breach of fiduciary duty claim against the individual defendants, such a claim must derive from the duty Mahalo USA's directors may have owed to the company and its creditors when the company became insolvent.

Typically, this scenario leads to questions of standing, such as whether a creditor may bring a direct claim for breach of fiduciary duty, or only a derivative claim. Also important is whether a bankruptcy trustee brings a fiduciary duty claim on the creditors' behalf, or only on the company's behalf (although the trustee's efforts might benefit the creditors).

No one has challenged standing here, but these questions are not merely academic for our purposes. They are a necessary starting point for answering the question, "Who was injured, and where?" Fortunately, recent Delaware case law has resolved the standing questions.

First, creditors of an insolvent corporation can almost never bring a direct action for breach of fiduciary duty. *Gheewalla*, 930 A.2d at 101–03. Such an action "would create a conflict between . . . directors' duty to maximize the value of the insolvent corporation for the benefit of all those having an interest in it, and the newly recognized direct fiduciary duty to individual creditors." *Id*. at 103. More specifically, "[d]irectors of insolvent corporations must retain the freedom to engage in vigorous, good faith negotiations with individual creditors for the benefit of the corporation." *Id*.

Second, creditors of an insolvent corporation (like shareholders generally) may bring a derivative action for breach of fiduciary duty—*i.e.*, an action to force the corporation to sue the relevant directors and officers. *Id*. at 101.

Third, a bankruptcy trustee has standing to pursue the creditors' claim for breach of fiduciary duty, but not because the trustee is somehow stepping into the shoes of the creditors. Rather, "a bankruptcy trustee may assert *only* the claims that belong to the bankruptcy estate," but "those claims may *include* the interests of creditors in the sense that the trustee has the duty to marshal the assets of the estate so that they can be distributed to creditors on a *pro rata* basis." *In re Scott Acquisition Corp.*, 344 B.R. 283, 290–91 (Bankr. D. Del. 2006) (quoting *Bondi v. Grant Thorton Int'l (In re Parmalat Sec. Litig.)*, 377 F. Supp. 2d 390, 420 (S.D.N.Y. 2005)) (emphasis added).

These answers generally make sense, although applying them to the question here—"Who was injured, and where?"—is not straightforward. Specifically, if Newsome is not considered to be asserting the creditors' claims, but rather Mahalo USA's claims, then *where* was Mahalo USA injured? And may we nonetheless consider injury to and location of Mahalo USA's creditors when evaluating personal jurisdiction?

In other contexts, identifying the location of the corporation is fairly simple. For example, when evaluating diversity jurisdiction, a corporation is considered domiciled where it is incorporated and where it has its "principal place

of business," 28 U.S.C. § 1332(c)(1), which the Supreme Court defines as "the place where a corporation's officers direct, control, and coordinate the corporation's activities," *Hertz Corp. v. Friend*, 130 S. Ct. 1181, 1192 (2010). In Mahalo USA's case, this would mean it exists in Delaware (place of incorporation) and Canada (principal place of business).

But these answers come by way of interpreting § 1332—a statute governing subject-matter jurisdiction, not personal jurisdiction. Personal jurisdiction restrictions come by way of the due process clause. Does the due process clause require us to treat Mahalo USA as located in any particular place for purposes of the injury it suffered? Similarly, does the due process clause require us to ignore where the alleged harm was principally felt?

We believe the answer to both questions is no. When Delaware courts say that the injured party is the corporation principally, and the creditors only derivatively, these courts are really responding to the question of when and how creditors may sue for those injuries. Thus, to say, "This is the corporation's injury," does not mean that the creditors have suffered no harm, just that the creditors may not sue directly for that harm—because, among other reasons, allowing such suits would create the same undesirable consequences as allowing each shareholder to sue directly for loss of value to his or her stock.

But that is a question of state substantive law and policy with respect to corporations. There is no reason to think that due process requires us to treat the

-16-

corporation and its creditors in the same way for purposes of determining personal jurisdiction. In particular, we do not believe due process requires us to ignore where the injury was actually felt, even if those who felt it face some impediment to suit on account of substantive corporation law. Thus, in a lawsuit claiming breach of fiduciary duty, we believe it is appropriate to consider harm to those to whom a fiduciary duty was owed—in this case, the creditors—when answering the question of who was injured and where.

We do not mean to imply that a forum may obtain personal jurisdiction over corporate officers simply because one to whom a fiduciary duty was owed is located in that forum. But a court evaluating personal jurisdiction need not ignore the creditors' or shareholders' places of residence simply because the cause of action belongs to the corporation.

Here, Newsome alleges that all or nearly all of Mahalo USA's creditors are Oklahoma residents. Defendants do not dispute this claim. In addition, Mahalo USA filed for bankruptcy in Oklahoma, which strongly suggests that many creditors reside in Oklahoma. We therefore conclude that we may appropriately consider the alleged injury in this case to have occurred in Oklahoma.

Thus, the answer to our question—"Who was injured, and where?"—is that Mahalo USA and its creditors were injured primarily in Oklahoma. Having concluded as much, we may turn to the purposeful direction analysis itself.

### c. *Purposeful Direction Elements*

As noted, purposeful direction in this suit has three requirements: (1) intentional action, (2) express aiming at the forum state, and (3) knowledge that the brunt of the injury would be felt in the forum state. *Dudnikov*, 514 F.3d at 1072. We analyze each element in turn.

The intentional action element requires little discussion. The record contains no suggestion that the individual defendants acted unintentionally when they took the steps that allegedly led to Mahalo USA's failure. Accordingly, Newsome satisfies the intentional action requirement.

The express aiming element requires Oklahoma to have been the "focal point" of the tort. *Dudnikov*, 514 F.3d at 1074. As we noted in *Dudnikov*, two Ninth Circuit cases help to illustrate the contours of this element.

In *Bancroft & Masters, Inc. v. Augusta National Inc.*, 223 F.3d 1082 (9th Cir. 2000), *overruled in part on other grounds in Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199 (9th Cir. 2006) (en banc), the Georgia owner of The Masters golf tournament sent a letter to a Virginia domain name registrar, invoking the registrar's procedures for disputing a California computer business's entitlement to "masters.com." The California business was then required to relinquish the domain name or obtain a declaratory judgment in its favor. The business chose the latter route, suing the Georgia entity in California. The Georgia entity challenged personal jurisdiction. *Bancroft*, 223

F.3d at 1084–85. Although the Georgia entity's letter "was formally sent to Virginia rather than California," it satisfied the "express aiming" requirement because its "purpose was specifically to target a known California business." *Dudnikov*, 514 F.3d at 1076 (citing *Bancroft*, 223 F.3d at 1087–88).

By contrast, in *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797 (9th Cir. 2004), an Ohio car dealership used a photograph of Arnold Schwarzenegger in its local advertisements without Schwarzenegger's permission. Schwarzenegger sued the Ohio dealership in California, but the California court determined it lacked personal jurisdiction. *Id*. at 799–800. "While [the dealership] perhaps *knew* Mr. Schwarzenegger lived in California, this was insufficient to convey jurisdiction there because the *intention*[] behind [the dealership's] advertisement was solely to entice local market Ohioans," rather than influence Schwarzenegger in California. *Dudnikov*, 514 F.3d at 1076 (citing *Schwarzenegger*, 374 F.3d at 799) (emphasis in original).

*Dudnikov* itself is also helpful. There, a Connecticut company communicated with eBay in California, attempting to cut short an eBay auction that allegedly infringed the Connecticut company's copyright. The promoters of that auction—a Colorado couple—sued the Connecticut company for declaratory judgment in Colorado. *Id*. at 1068–69. The Connecticut company sought dismissal for lack of personal jurisdiction, arguing that the express aiming requirement was not satisfied because it did not know the plaintiffs operated from

Colorado. *Id*. at 1076. The plaintiffs' allegations, however, established that their Colorado location was obvious from the eBay auction page. *Id*. This, we said in *Dudnikov*, was enough at the pleading phase to establish express aiming at Colorado. *Id*. at 1076–77.

Here, the individual defendants do not contest that they knew Mahalo USA operated exclusively in Oklahoma, making Oklahoma the focal point of any tort against Mahalo USA they may have committed. Accordingly, Newsome has established that these defendants expressly aimed their actions at Oklahoma when they acted toward Mahalo USA.

The final requirement is knowledge that the brunt of the injury would be felt in the forum state. We have already concluded Newsome established that the individual defendants knew Mahalo USA's business operated in Oklahoma. At the pleading phase, then, it is a fair inference that the individual defendants knew that the brunt of any injury to Mahalo USA would be felt in Oklahoma. *See id*. at 1077 ("in satisfying [the] first two [elements of the 'purposeful direction' test], plaintiffs have established that defendants acted with more than foresight (or knowledge) that effects would be felt in [the forum]").

Newsome has therefore satisfied the three elements of the purposeful direction test as to the individual defendants.

### 2. *"Arising Out Of"*

Aside from purposeful direction, the specific personal jurisdiction test requires "the plaintiff's injuries [to] arise out of defendant's forum-related activities." *Id.* at 1071. We have stated that there are potentially two tests here—the but-for test and the proximate cause test:

> Under the [but-for] approach, any event in the causal chain leading to the plaintiff's injury is sufficiently related to the claim to support the exercise of specific jurisdiction. The [proximate cause] approach, by contrast, is considerably more restrictive and calls for courts to examine whether any of the defendant's contacts with the forum are relevant to the merits of the plaintiff's claim.

*Id.* at 1078 (internal quotation marks omitted; certain alterations incorporated).

We have so far refused to choose one test over the other, *id.* at 1079, and we still need not pick between the two to resolve this case. Here, Newsome satisfies the more restrictive proximate cause test.

Newsome alleges that the individual defendants knowingly acted in Canada to destroy a company operating entirely in Oklahoma. That allegation, along with its supporting details, forms the basis of both Newsome's claim to personal jurisdiction and Newsome's claim on the merits. Newsome therefore satisfies the proximate cause test.

But this raises a question about just how far the merits of a plaintiff's claims should matter in the personal jurisdiction analysis. As noted, "the

plaintiff's *injuries* must arise out of [the] defendant's forum-related activities." *Id*. at 1071 (emphasis added; internal quotation marks omitted). Thus, one might reason that a plaintiff who fails to allege a recognized injury cannot possibly establish that the defendant's forum-related activities gave rise to the lawsuit.

Defendants present just such an argument here. They attempt to bolster the lack of personal jurisdiction by claiming that no relevant injurious contacts exist because Newsome's complaint fails to allege a valid injury—or in other words, Newsome fails to state a claim. This argument runs as follows.

First, as discussed above, under Delaware law, directors of a wholly-owned subsidiary usually owe their fiduciary duties entirely to the parent, not the subsidiary, as long as the subsidiary is solvent. Thus, if Mahalo USA was solvent, its directors could—in theory at least—run it into the ground to enrich Mahalo Canada.

Second, when a subsidiary becomes *insolvent*, its directors owe a fiduciary duty to the subsidiary's creditors. So if Mahalo USA reached a point of insolvency, its directors could no longer act solely for Mahalo Canada's benefit.

Third, some Delaware cases suggest a sort of twilight between solvency and insolvency which they call the "zone of insolvency." In Delaware, when a solvent subsidiary is only "navigating in the zone of insolvency," the subsidiary directors' fiduciary duties remain focused on the parent, and there is no duty

owed to the subsidiary. *Gheewalla*, 930 A.2d at 101.[4]   In other words, the zone

of insolvency is treated the same as solvency; only actual insolvency requires

subsidiary directors to focus on the creditors.

Here, Newsome's claims for breach of fiduciary duty turn on Mahalo USA

being insolvent, rather than just close to it.  But Newsome's complaint repeatedly

(and ambiguously) alleges that Mahalo USA was "insolvent or in the zone of

insolvency" during the relevant time period.  *See, e.g.*, App. 5, 7, 14, 21, 27, 47,

48, 51, 53, 56, 57, 59, 62, 63.  Thus, under a Rule 12(b)(6) analysis, Newsome's

complaint might merit dismissal because "insolvent or in the zone of insolvency"

is effectively the same as alleging "liable or not liable."

While we recognize the potential defect in the substance of Newsome's

allegations, we believe it is important to keep the 12(b)(2) and 12(b)(6) analyses

distinct.  *Cf. Smith v. Sperling*, 354 U.S. 91, 94–95 (1957) (admonishing lower

court for holding a hearing on the merits to determine whether diversity

jurisdiction existed); 5B Charles Alan Wright et al., *Federal Practice &*

*Procedure* § 1351 (3d ed., Dec. 2012 update) ("A contention that the complaint

states no claim against the defendant is not properly raised on a motion to dismiss

for want of jurisdiction . . . .").  When we require "the plaintiff's injuries [to]

arise out of [the] defendant's forum-related activities," *Dudnikov*, 514 F.3d at

---

[4] The Delaware Supreme Court has never defined "zone of insolvency."
*See id.* at 98 n.20.

-23-

1071 (internal quotation marks omitted), we do not mean to invite parties to argue whether the law recognizes or grants redress for the plaintiff's claimed injury.

The import of the "arising out of" analysis is whether the plaintiff can establish that the claimed injury resulted from the defendant's forum-related activities. In this case, the answer is yes. Newsome has sufficiently alleged at this stage of the proceedings that the individual defendants took actions that caused Mahalo USA's demise. Whether or not Newsome can present a legal theory that would hold the individual defendants liable for that demise is a question the district court may address on remand.[5] But Newsome, by showing that this lawsuit arises out of the defendants' purposefully directed forum-related activities, has established "minimum contacts" sufficient to justify exercising personal jurisdiction over the individual defendants.

### 3. "Fair Play and Substantial Justice"

When a plaintiff satisfies its minimum contacts burden, the burden shifts to the defendant to demonstrate that exercising personal jurisdiction would nonetheless "offend traditional notions of fair play and substantial justice." *Dudnikov*, 514 F.3d at 1080 (internal quotation marks omitted). "Such cases are rare." *Rusakiewicz v. Lowe*, 556 F.3d 1095, 1102 (10th Cir. 2009). The defendant "must present a compelling case that the presence of some other

---

[5] Defendants moved to dismiss under both Rules 12(b)(2) and 12(b)(6), but the district court reached only the 12(b)(2) question.

considerations would render jurisdiction unreasonable." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985). This usually involves five considerations:

> (1) the burden on the defendant, (2) the forum state's interest in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental substantive social policies.

*OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1095 (10th Cir. 1998).

*OMI* is worth summarizing because defendants rely upon it heavily. In the mid-1980s, a Kansas company brought a patent lawsuit in Kansas against the Iowa subsidiary of a Canadian corporation. Four years into the lawsuit, the Canadian corporation brought a new lawyer into the team who was apparently the first to ask whether the Canadian corporation's insurance carrier would cover the costs of defending the lawsuit. The Iowa subsidiary then notified the insurance carrier—another Canadian company—which refused to indemnify. *Id*. at 1089–90.

The Iowa subsidiary then sued the Canadian insurance carrier in Kansas—apparently because the patent lawsuit was also pending there. The insurance carrier moved to dismiss for lack of personal jurisdiction. The district court denied that motion but we reversed. *Id*. at 1090. Although we found sufficient

minimum contacts, *id*. at 1095, we concluded that exercising jurisdiction over the insurance carrier would offend fair play and substantial justice.

As we analyzed the five considerations quoted above, we discussed numerous factors specific to the case. But one factor came back again and again, namely, that Canadian law would govern the dispute. Indeed, we made that point seven times and it favored the Canadian insurance carrier with respect to all five considerations. *Id*. at 1096–98. Moreover, four times we mentioned that the insurance carrier was Canadian and had negotiated and executed the insurance contracts in Canada with the Canadian parent corporation. *Id*. Thus, everything about the lawsuit looked Canadian, and so we held that "fair play and substantial justice" could not accommodate the suit in Kansas. *Id*. at 1098.

A similar case on which defendants also rely is *Benton v. Cameco Corp.*, 375 F.3d 1070 (10th Cir. 2004). The plaintiff in *Benton* had entered into a memorandum of understanding to create a joint venture with a Canadian uranium mining company. The memorandum required approval by the Canadian company's board, but the board refused to sign off. The plaintiff, a Colorado resident, then sued the Canadian company in Colorado for breach of contract and tortious interference with business relationships. *Id*. at 1073.

As in *OMI*, we found sufficient minimum contacts but nonetheless held that exercising jurisdiction would offend fair play and substantial justice. We analyzed the five considerations set forth in *OMI*, and—again, just like *OMI*—the

-26-

fact Canadian law would govern the dispute was a factor in favor of the Canadian company with respect to all five considerations.  Indeed, for most considerations it was the only relevant factor.  *See id.* at 1079–80.

Before we likewise analyze the five factors of fair play and substantial justice as they relate to this case, we note that we do not accept defendants' attempt to analogize *OMI* and *Benton* to the facts at hand.  Given the heavy weight given to the applicability of Canadian law in *OMI* and *Benton*, defendants argue that Canadian law "may apply to some of the claims."  Aple. Br. at 51.  Specifically, they reason that Oklahoma's conflict of laws principles might apply Canadian law to the aiding and abetting claims, and therefore the principles underlying *OMI* and *Benton* should also apply here.

This argument is far too speculative at this juncture.  Although we need not resolve the question here, there appears to be at least as much chance that Delaware law would govern the aiding and abetting claims.  It is undisputed that Delaware law governs the breach of fiduciary duty claims against at least the Mahalo USA directors.  A claim of aiding and abetting such a breach is well established in Delaware law.  *See In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 72 (Del. 1995) ("A claim for aiding and abetting requires the following three elements: (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, and (3) a knowing participation in that breach . . . .").  And

according to Delaware courts' interpretation of the internal affairs doctrine,[6] if Delaware law governs the breach of fiduciary duty claim, "Delaware law therefore also governs the aiding and abetting claim predicated on the underlying fiduciary breach." *Hamilton Partners, L.P. v. Englard*, 11 A.3d 1180, 1211–12 (Del. Ch. 2010).

Thus, we give no weight to defendants' assertion that Canadian law may govern some of the claims at issue here. We do not say that defendants are necessarily incorrect, but they fail to establish anything close to the certainty displayed in *OMI* and *Benton*.

With this background, we turn to the five factors as applied to this case.

### a. "Burden on the Defendant"

"While not dispositive, the burden on the defendant of litigating the case in a foreign forum is of primary concern in determining the reasonableness of personal jurisdiction." *OMI*, 149 F.3d at 1096.

Here, defendants analogize themselves to the Canadian mining company in *Benton* which had "no office or property in Colorado, [was] not licensed to do business in Colorado, and [had] no employees in Colorado." 375 F.3d at 1079.

---

[6] "The internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders . . . ." *Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982).

We accept that these defendants do not themselves have property or offices in Oklahoma, but Mahalo USA does—or at least it did until creditors seized them. In any event, defendants do not explain how that fact relates to the question of burden. And we see no particular burden simply in the travel from Alberta to Oklahoma that may be required as part of this lawsuit. We therefore believe this factor does not weigh in the individual defendants' favor.

### b. *"The Forum State's Interest in Resolving the Dispute"*

As to this factor, the individual defendants make a curious argument: "[T]he forum does not have a strong interest in the plaintiff, because the plaintiff is a trustee acting under the auspices of the United States Bankruptcy Court. As such, it is the United States, not particularly Oklahoma, that has an interest in resolving the dispute." Aple. Br. at 53. This implies that Newsome can sue defendants in *any* United States jurisdiction. If anywhere in the United States is fair game, then Oklahoma has at least as strong an interest as anywhere else, given the presence of the bankruptcy filing and many of the creditors.

Accordingly, defendants have not persuaded us that this factor cuts in their favor.

### c. *"The Plaintiff's Interest in Receiving Convenient and Effective Relief"*

"This factor may weigh heavily in cases where a Plaintiff's chances of recovery will be greatly diminished by forcing him to litigate in a another forum

because of that forum's laws or because the burden may be so overwhelming as to practically foreclose pursuit of the lawsuit." *OMI*, 149 F.3d at 1097. Neither side has offered any helpful arguments in this regard. We note, however, that if this case cannot proceed in Oklahoma, the most likely alternative forum is not Canada, but Delaware. Those who accept directorships of Delaware corporations consent to Delaware jurisdiction for lawsuits arising out of their duties as directors. Del. Code Ann. tit. 10, § 3114(a). Thus, at least the Mahalo USA directors appear to be subject to personal jurisdiction in Delaware. Further, Delaware courts do not hesitate to use an aiding-and-abetting cause of action to exercise personal jurisdiction over nonresident defendants where a Delaware corporation is involved. *See Matthew v. Fläkt Woods Group SA*, 56 A.3d 1023, 1026–30 (Del. 2012); *Hamilton Partners*, 11 A.3d at 1198–99.

We cannot see how litigating in Delaware would be more convenient or effective. Defendants therefore have not convinced us that this factor favors them.

### d. *"The Interstate Judicial System's Interest in Obtaining the Most Efficient Resolution of Controversies"*

"Key to this inquiry are the location of witnesses, where the wrong underlying the lawsuit occurred, what forum's substantive law governs the case,

and whether jurisdiction is necessary to prevent piecemeal litigation." *OMI*, 149 F.3d at 1097 (citations omitted).

*Location of Witnesses.* Although impossible to say for certain at this early stage, we presume that most witnesses and much of the documentary discovery will be in Alberta.

*Where the Wrong Underlying the Lawsuit Occurred.* This, of course, is a fundamental point of contention among the parties. The supposed breaches of fiduciary duty happened in Canada but had their injurious effect mostly in Oklahoma. Given Oklahoma's interest in providing redress for injuries within its borders, we consider the alleged "wrong underlying the lawsuit" to have occurred in Oklahoma. *See supra* Part II.B.1.b.

*What Forum's Substantive Law Governs the Case.* As already noted above, Delaware law will govern the Mahalo USA directors' claims, and a fair chance exists that Delaware law will also govern the aiding and abetting claims.

*Whether Jurisdiction is Necessary to Prevent Piecemeal Litigation.* This factor, of course, can become somewhat circular. One reason why litigation becomes piecemeal is lack of jurisdiction over a particular defendant. But if a court lacks jurisdiction, it cannot then turn around and say that it should have jurisdiction to prevent litigation from becoming piecemeal.

In any event, Oklahoma jurisdiction is probably not necessary to prevent piecemeal litigation. From our current vantage point, at least, it appears that Delaware is an available alternative forum for all parties.

*Synthesis.* On balance, we believe that the sub-factors are effectively neutral. Thus, defendants have not convinced us that "the interstate judicial system's interest in obtaining the most efficient resolution of controversies" necessarily counsels in favor of a forum other than Oklahoma.

### e. "The Shared Interest of the Several States in Furthering Fundamental Substantive Social Policies"

"Important to this inquiry is the extent to which jurisdiction in the forum state interferes with the foreign nation's sovereignty." *OMI*, 149 F.3d at 1098. This too can be broken into multiple sub-factors, including "whether one of the parties is a citizen of the foreign nation, whether the foreign nation's law governs the dispute, and whether the foreign nation's citizen chose to conduct business with a forum resident." *Id*.

We do not believe these various sub-factors need individual treatment. Defendants are foreign citizens but a foreign nation's law will not govern the bulk of these claims (or maybe any of them), and these defendants definitely ran a business operating solely in Oklahoma. And again, the Mahalo USA directors have almost certainly consented to be sued in the United States (in Delaware). Thus, the interests of Canadian sovereignty are limited.

* * *

A handful of considerations favor defendants. But they have not carried their overall burden of convincing us that Oklahoma jurisdiction would offend fair play and substantial justice. We conclude that Oklahoma courts may properly exercise personal jurisdiction over the individual defendants.

### 4. The Fiduciary Shield Doctrine

The district court alternatively held that the fiduciary shield doctrine would protect the individual defendants even if personal jurisdiction were otherwise appropriate. "Under the 'fiduciary shield doctrine,' a nonresident corporate agent generally is not individually subject to a court's jurisdiction based on acts undertaken on behalf of the corporation." 3A William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Corporations* § 1296.20 (Sept. 2012 update).

On two fronts, our case law displays significant confusion over this doctrine. First, we have sometimes failed to distinguish between the fiduciary shield doctrine and a related concept that cautions against imputing contacts to a business's operators—which we will call the "no-imputed-contacts rule." Second, at times we have failed to clarify whether the fiduciary shield doctrine is dictated by federal due process (*i.e.*, whether it is integral to the minimum contacts test) or whether it only exists, if at all, as a matter of state law.

As we explain below, the no-imputed-contacts rule is integral to the minimum contacts due process test. The fiduciary shield doctrine, however, only

exists as a matter of state law. We review interpretations of state law de novo.

*Willis v. Bender*, 596 F.3d 1244, 1254 (10th Cir. 2010). We conclude that

Oklahoma has not yet adopted the fiduciary shield doctrine, and we refrain from

predicting whether it would. Even if it adopted the doctrine generally, we predict

it would not apply the doctrine to allegations of breach of fiduciary duty, as in

this case. The fiduciary shield doctrine therefore has no application here.

### a. The Fiduciary Shield Doctrine vs. the No-Imputed-Contacts Rule

Jurisdiction over a corporation in a particular forum does not automatically

confer jurisdiction over that corporation's employees. If, for example, a Kansas

company markets a defective product in Oklahoma and the product ends up

injuring an Oklahoma resident, that is usually enough to confer personal

jurisdiction over the company in Oklahoma courts in the ensuing product liability

suit. But under the no-imputed-contacts rule, Oklahoma's jurisdiction over the

company does not necessarily give Oklahoma jurisdiction over the company's

Kansas employees. Employees' "contacts with [the forum state] are not to be

judged according to their employer's activities there." *Calder*, 465 U.S. at 790.

The fiduciary shield doctrine, by contrast, gives even greater protection to

employees of companies. It maintains that even if a particular Kansas employee

has substantial contacts with Oklahoma—*e.g.*, the employee repeatedly traveled to

Oklahoma to promote the product—those contacts will not count against the

-34-

employee in the personal jurisdiction analysis so long as the employee acted solely on the corporation's behalf.

Both the fiduciary shield doctrine and the no-imputed-contacts rule are on display—although neither one by name—in the famous Supreme Court cases of *Calder v. Jones*, *supra*, and *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984). At least by implication, if not explicitly, these cases hold that the no-imputed-contacts rule flows from considerations of due process, whereas the fiduciary shield doctrine does not enjoy constitutional status.

In *Calder*, a California plaintiff brought a libel suit in California against two *National Enquirer* employees residing in Florida. The defendants tried to defeat personal jurisdiction, arguing that they were not responsible for circulating the offending article in California: "ordinary employees [cannot] control their employer's marketing activity." *Calder*, 465 U.S. at 789. This, in essence, claims the protection of the fiduciary shield.

The Supreme Court rejected this argument:

> [Defendants'] intentional, and allegedly tortious, actions were expressly aimed at California. [One defendant] wrote and [the other] edited an article that they knew would have a potentially devastating impact upon [the plaintiff]. And they knew that the brunt of that injury would be felt by respondent in the State in which she lives and works . . . .

*Id*. at 789–90. Accordingly, the fiduciary shield (although not invoked by name) did not apply. The defendants were "correct," however, "that their contacts with

California are not to be judged according to their employer's activities there." *Id.* at 790. But as to the fiduciary shield doctrine, the Court emphasized that the defendants' "status as employees does not somehow insulate them from jurisdiction." *Id.* Nonetheless, it is improper to impute contacts to employees: "Each defendant's contacts with the forum State must be assessed individually." *Id.*

*Keeton*, decided the same day as *Calder*, was also a libel suit where the defendants arguably had little contact with the forum state, but with the added fact that the *plaintiff* likewise had little contact with the forum state. *Keeton* largely focused on the problem of the plaintiff's lack of contacts, and on some quirks specific to the forum state's laws. But *Keeton* also contained the following footnote that, like *Calder*, alternates between rejection of the fiduciary shield doctrine and endorsement of the no-imputed-contacts rule:

> In addition to [defendant] Hustler Magazine, Inc., Larry Flynt, the publisher, editor and owner of the magazine, and L.F.P., Inc., Hustler's holding company, were named as defendants in the District Court. It does not of course follow from the fact that jurisdiction may be asserted over Hustler Magazine, Inc., that jurisdiction may also be asserted over either of the other defendants [*i.e.*, the no-imputed-contacts rule]. In *Calder v. Jones*, we today reject the suggestion that employees who act in their official capacity are somehow shielded from suit in their individual capacity [*i.e.*, rejecting the fiduciary shield doctrine]. But [returning to the no-imputed-contacts rule] jurisdiction over an employee does not automatically follow from jurisdiction over the corporation which employs him; nor does jurisdiction

> over a parent corporation automatically establish jurisdiction over a wholly owned subsidiary. Each defendant's contacts with the forum State must be assessed individually.

*Keeton*, 465 U.S. at 781 n.13 (citations omitted).

In sum, the no-imputed-contacts rule prevents us from attributing Oklahoma contacts to defendants solely because Mahalo USA had contacts in Oklahoma. Our minimum contacts analysis, *supra* Part II.B.1–3, adheres to this rule. The fiduciary shield doctrine, however, has no necessary connection to the minimum contacts analysis. Thus, if the fiduciary shield doctrine exists at all, it must be a matter of state law—such as "a judicial rule of construction for interpreting the intended scope of a state's long-arm statute." 3A *Fletcher Cyclopedia of the Law of Corporations* § 1296.20.

### b. The Fiduciary Shield Doctrine in the Tenth Circuit

Although *Calder* and *Keeton* kept the fiduciary shield doctrine and the no-imputed-contacts rule separate—and plainly put only the latter in the due process category—we have conflated these distinctions in our own decisions.

Our first clear application of the fiduciary shield came in *Ten Mile Industrial Park v. Western Plains Service Corp.*, 810 F.2d 1518 (10th Cir. 1987). *Ten Mile* involved a lawsuit in Wyoming against several South Dakota corporations and their officers for breach of contract, fraud, negligence, tortious interference with business relationships, and slander of business reputation. Our

-37-

opinion never uses the words "fiduciary shield," but it is often cited in subsequent

cases as a fiduciary shield case on account of this passage:

> [The corporate defendants'] contacts cannot be
> attributed to the [corporate officers]. Where the acts of
> individual principals of a corporation in the jurisdiction
> were carried out solely in the individuals' corporate or
> representative capacity, the corporate structure will
> ordinarily insulate the individuals from the court's
> jurisdiction. Jurisdiction over the representatives of a
> corporation may not be predicated on jurisdiction over
> the corporation itself, and jurisdiction over the
> individual officers and directors must be based on their
> individual contacts with the forum state.

*Id.* at 1527 (citations omitted).

This language actually displays both the fiduciary shield doctrine and the

no-imputed-contacts rule, and does not specify whether the fiduciary shield was a

product of federal or Wyoming law. But in any event, *Calder* and *Keeton* make

clear that the fiduciary shield doctrine does not come by way of federal due

process. Thus, *Ten Mile* was at most a statement about Wyoming law.

We put the state-law nature of the fiduciary shield doctrine front and center

in *Home-Stake Production Co. v. Talon Petroleum, C.A.*, 907 F.2d 1012 (10th Cir.

1990). *Home-Stake* began as a lawsuit in Oklahoma to pierce the corporate veil

and enforce a contract judgment against one of the corporation's principals (who

lived abroad). The principal raised the fiduciary shield doctrine but we noted that

he had "not cited any Oklahoma cases discussing this equitable doctrine, nor has

our own research uncovered any." *Id.* at 1017.

We refused to predict whether Oklahoma would adopt the fiduciary shield doctrine. We instead surveyed other jurisdictions' approaches to the fiduciary shield and determined it was based heavily in equity. In light of the principal's alleged unlawful behavior, we concluded that the fiduciary shield would not protect the principal even if Oklahoma would adopt the fiduciary shield doctrine generally. *Id*. at 1017–19.

A third, more recent case discusses the fiduciary shield doctrine: *Rusakiewicz v. Lowe*, 556 F.3d 1095 (10th Cir. 2009). The plaintiff in *Rusakiewicz* had sued certain California residents in Utah for abuse of process and wrongful use of civil proceedings. The California residents argued that the acts forming the basis of the plaintiff's suit—voting as a corporate board to fund an allegedly malicious lawsuit—were acts they took solely in their capacity as directors of a corporation. They therefore invoked the fiduciary shield doctrine, citing *Ten Mile* (but not *Home-Stake*). *Id*. at 1102.

We rejected the fiduciary shield, but our discussion shows some lingering confusion over the difference between the fiduciary shield and the no-imputed-contacts rule. We interpreted *Ten Mile* as establishing no more than the no-imputed-contacts rule. *See id*. ("The rationale [of *Ten Mile*] was that . . . jurisdiction over the representatives of a corporation may not be predicated on jurisdiction over the corporation itself."). And because the *Rusakiewicz* complaint alleged the defendants' own contacts with Utah, not simply "contacts

-39-

that have been imputed to them on account of the actions of the corporation," *id.* at 1103, there was no due process problem.

*Rusakiewicz* therefore seems to treat the fiduciary shield doctrine as nonexistent—or perhaps nonexistent in Utah, although the opinion nowhere approaches the subject as a matter of Utah law.

### c. The Fiduciary Shield Doctrine in Oklahoma

Despite the confusion displayed in our case law, the Supreme Court has made clear that the fiduciary shield is a question of state law, not due process. On this, the parties agree.

Naturally, then, Newsome argues that the fiduciary shield doctrine does not exist in Oklahoma. In response, defendants claim Newsome waived any such argument because he argued below (in response to their motion to dismiss) that the fiduciary shield doctrine *does* exist in Oklahoma—but does not apply in this case.

Defendants correctly characterize Newsome's response argument below. But in a supplemental brief solicited by the district court, Newsome switched horses. Arguing from *Keeton* and *Calder* that due process itself does not give rise to the fiduciary shield doctrine, Newsome asserted,

> Importantly, there are, to date, no Oklahoma state court cases we have been able to locate that adopt the fiduciary shield doctrine as a limit on the extent of the Oklahoma long arm statute. Rather, the Oklahoma Revised Statutes extend personal jurisdiction to the

furthest extent of the constitutional authority . . . .
Thus, the Defendants' proposed construction of the
fiduciary shield doctrine cannot be coherently integrated
with the Oklahoma long arm statute.

App. 1618–19 (emphasis removed). Given that the district court authorized

Newsome to file the brief in which this argument appeared, we conclude that

Newsome did not waive it. We therefore must determine whether any Oklahoma

authority establishes the fiduciary shield as a matter of Oklahoma law.

We agree with Newsome that the Oklahoma long-arm statute does not

provide such authority. As noted previously, it permits Oklahoma courts to

exercise jurisdiction up to the limits of federal due process, Okla. Stat. Ann., tit.

12, § 2004(F), and due process does not incorporate the fiduciary shield. Further,

as in *Home-Stake* more than twenty years ago, the parties have "not cited any

Oklahoma [state-court] cases discussing [the fiduciary shield] doctrine, nor has

our own research uncovered any." 907 F.2d at 1017.

Defendants rely heavily upon Oklahoma federal district court cases

applying the fiduciary shield. But all of these cases cite either *Ten Mile* or

*Home-Stake* as authority for the fiduciary shield doctrine in Oklahoma. *See*

*Outdoor Channel v. Performance One Media, LLC*, 826 F. Supp. 2d 1271, 1297

(N.D. Okla. 2011) (relying on *Ten Mile*); *Hnath v. Hereford*, 757 F. Supp. 2d

1130, 1136 (N.D. Okla. 2010) (relying on *Home-Stake*); *McClelland v. Watling*

*Ladder Co.*, 729 F. Supp. 1316, 1319–21 (W.D. Okla. 1990) (relying on *Ten*

-41-

*Mile*).  As noted, *Ten Mile*'s statements about the fiduciary shield must be confined to the doctrine as applied in Wyoming.  And *Home-Stake* assumed without deciding that Oklahoma would adopt the fiduciary shield doctrine.  Accordingly, these decisions' reliance on *Ten Mile* and *Home-Stake* was misplaced.  They do not establish the existence of the fiduciary shield doctrine as a matter of Oklahoma law.

Given this lack of authority, we question whether we can predict with any confidence that Oklahoma courts would graft the fiduciary shield doctrine into a long-arm statute intended to reach as far as due process allows.  But similar to *Home-Stake*, we feel sufficiently certain that Oklahoma would not apply the fiduciary shield doctrine in this case, even if we assumed that Oklahoma courts would adopt it as a general matter.

All of the fiduciary shield cases discussed above involve run-of-the-mill contract and tort claims brought against both a corporation and its fiduciary.  We have not located any case in which the fiduciary shield doctrine was applied to a claim for breach of fiduciary duty, which can only be brought against the fiduciary.

Some jurisdictions hold that the fiduciary shield does not apply to claims such as breach of fiduciary duty.  Illinois, for example, holds that the fiduciary shield does not protect an officer or director acting to "serve his personal interests."  *Rollins v. Ellwood*, 565 N.E.2d 1302, 1318 (Ill. 1990).  The Fifth

Circuit agrees with this approach. *Lewis v. Fresne*, 252 F.3d 352, 359 n.6 (5th Cir. 2001) ("'[T]he shield is removed if the individual's personal interests motivate his actions . . . .'" (quoting *Darovec Mktg. Grp., Inc. v. Bio-Genics, Inc.*, 42 F. Supp. 2d 810, 819 (N.D. Ill. 1999))); *cf. Dodson Int'l Parts, Inc. v. Altendorf*, 181 F. Supp. 2d 1248, 1255 (D. Kan. 2001) (relying on *Lewis* for the idea that "[w]hen the claim alleges or necessarily involves the personal interests or motives of the individual defendant, the fiduciary shield doctrine does not apply"). And the Southern District of New York has stated, "If any suggestion of self-dealing is made by the plaintiffs' Complaint and other documents submitted to this Court, the fiduciary shield doctrine will not be applied." *In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*, 666 F. Supp. 547, 573 (S.D.N.Y. 1987). In essence, regardless of whatever else the fiduciary shield may protect, it makes little sense to apply it to claims of breach of fiduciary duty—a claim alleging, by its very nature, that the agent did *not* act on the principal's behalf, but in the agent's own interest at the principal's expense.

To conclude, whether or not Oklahoma would adopt the fiduciary shield doctrine as a general matter, we believe it would not apply it to the claims Newsome asserts against the individual defendants. The fiduciary shield doctrine therefore does not provide a basis for defendants to avoid personal jurisdiction in Oklahoma.

### C. *Personal Jurisdiction for the Law Firm*[7]

Finally, we turn to the remaining party—the law firm—against which Newsome asserts two causes of action. First, he asserts breach of fiduciary duty based on the law firm representing both Mahalo Canada and Mahalo USA when the two companies' interests allegedly conflicted. This is effectively a legal malpractice claim. *See, e.g.*, *RFT Mgmt. Co., L.L.C. v. Tinsley & Adams L.L.P.*, 732 S.E.2d 166, 173 (S.C. 2012) (stating, "as a general matter," that the only difference between breach of fiduciary duty based on a conflict of interest and legal malpractice based on a conflict of interest is the need to prove an attorney-client relationship in the latter), *cert. denied*, 133 S. Ct. 1255 (2012). Second, Newsome claims the law firm aided and abetted the other defendants' breaches of fiduciary duty by advising them and performing other legal services to facilitate the Ableco transaction.

The law firm establishes by affidavit that it performed all of its services related to this lawsuit in Canada. Newsome does not contradict this. Further, no party claims that the Ableco transaction was negotiated, arranged, closed, or documented anywhere but outside of Oklahoma (and mostly in Canada) save for liens placed on Oklahoma property (which the law firm "facilitated," App. 263).

---

[7] This analysis also applies to Lawson in his capacity as an attorney for the firm.

The law firm did, however, receive payments from Mahalo USA's Oklahoma bank accounts.

Courts are split regarding whether out-of-state legal work on an out-of-state matter can subject an out-of-state lawyer to personal jurisdiction in the client's home forum. *See generally* Marjorie A. Shields, *In Personam Jurisdiction, Under Long-Arm Statute, over Nonresident Attorney in Legal Malpractice Action*, 78 A.L.R.6th 151 (2012). The majority view answers this query in the negative. According to the majority, even though a client may feel the effects of the lawyer's misdeeds in the client's home forum, the client cannot sue the lawyer there on that account alone. *See, e.g.*, *Sawtelle v. Farrell*, 70 F.3d 1381, 1391–94 (1st Cir. 1995) (no New Hampshire jurisdiction over Florida and Virginia attorneys hired by New Hampshire residents to represent their son's estate in Florida litigation, despite defendants' transmittal of legal advice in letters and phone calls to New Hampshire); *Sher v. Johnson*, 911 F.2d 1357, 1363 (9th Cir. 1990) (no California jurisdiction over Florida law firm that represented California resident in Florida); *Austad Co. v. Pennie & Edmonds*, 823 F.2d 223, 226–27 (8th Cir. 1987) (no South Dakota jurisdiction over New York law firm that represented South Dakota corporation in patent litigation in Maryland, even though firm had sent an associate to South Dakota to gather information); *Exponential Biotherapies, Inc. v. Houthoff Buruma N.V.*, 638 F. Supp. 2d 1, 7–9 (D.D.C. 2009) (no D.C. jurisdiction over Netherlands law firm that represented D.C. resident in

European transaction); *We're Talkin' Mardi Gras, LLC v. Davis*, 192 F. Supp. 2d 635, 636–38, 639–41 (E.D. La. 2002) (no Louisiana jurisdiction over a Georgia patent attorney who, while representing a Louisiana company and its Texas partners, performed all legal work in Georgia). The majority reasons that representing a client residing in a distant forum is not necessarily a purposeful availment of that distant forum's laws and privileges. *See Sawtelle*, 70 F.3d at 1394; *Austad*, 823 F.2d at 226–27. The client's residence is often seen by the majority as a "mere fortuity." *We're Talkin' Mardi Gras*, 192 F. Supp. 2d at 640.

The minority view, by contrast, shows no hesitation to exercise jurisdiction over out-of-state attorneys. *See, e.g.*, *Keefe v. Kirschenbaum & Kirschenbaum, P.C.*, 40 P.3d 1267, 1272–73 (Colo. 2002) (Colorado could exercise jurisdiction over New York attorney who represented Colorado client in New York litigation over many years); *Cartlidge v. Hernandez*, 9 S.W.3d 341, 348 (Tex. App. 1999) (Texas could exercise jurisdiction over Nevada attorney who represented Texas client in Nevada litigation); *Brown v. Watson*, 255 Cal. Rptr. 507, 512–13 (Cal. Ct. App. 1989) (California could exercise jurisdiction over Texas attorneys who represented California clients in Texas). The minority view reasons that attorneys can accept or reject representing clients in distant forums, and that those who accept such representation have "fair warning" that they might be sued for malpractice in the client's forum. *Keefe*, 40 P.3d at 1272. The minority also contends that the normal communications that make up an active attorney-client

-46-

relationship are the sort of repeated, purposeful contacts with the client's home forum sufficient to establish personal jurisdiction. *See Cartlidge*, 9 S.W.3d at 348.

We agree with the majority that an out-of-state attorney working from out-of-state on an out-of-state matter does not purposefully avail himself of the client's home forum's laws and privileges, at least not without some evidence that the attorney reached out to the client's home forum to solicit the client's business. Other distinguishing factors may be relevant as well, which we need not catalogue here. In this case, the law firm is a Canadian entity hired by Canadian-owned and -headquartered companies to perform legal work from Canada on transactions consummated in Canada. Further, the law firm never reached out to Mahalo USA in Oklahoma to solicit its business, but instead had Mahalo USA's business by virtue of representing its Canadian parent company in Canada. Save for "facilitat[ing]" the placement of liens on Oklahoma property and receiving payments from Mahalo USA's Oklahoma bank accounts, the law firm had virtually no connection to Oklahoma as relevant to the circumstances that gave rise to this lawsuit.

Newsome asserts the law firm made numerous Oklahoma contacts during bankruptcy proceedings, but "the plaintiff's injuries must arise out of defendant's forum-related activities." *Dudnikov*, 514 F.3d at 1071. Newsome is not claiming injury arising from the bankruptcy proceedings themselves—*e.g.*, some sort of

malpractice committed in representing Mahalo USA before the bankruptcy court. Newsome instead claims injury that supposedly led to Mahalo USA's demise. As to that claim, the law firm did not purposefully direct its efforts at Mahalo USA in Oklahoma. Accordingly, the district court properly dismissed the law firm for lack of personal jurisdiction.

## III. Conclusion

For the foregoing reasons, we AFFIRM the district court's dismissal of Burnet, Duckworth & Palmer and Jeff Lawson (in his capacity as an attorney for Burnet, Duckworth & Palmer) but REVERSE as to James Burns, David Butler, Duncan Chisholm, Gary Dundas, William Gallacher, Jeff Lawson (in his capacity as a Mahalo Canada director), and Kevin Wolfe. We remand for further proceedings consistent with this opinion.