# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued September 16, 2013      Decided November 12, 2013

No. 12-7009

THOMPSON HINE, LLP, AN OHIO LIMITED LIABILITY
PARTNERSHIP,
APPELLANT

v.

ELICKO TAIEB, AN INDIVIDUAL CITIZEN OF FLORIDA AND EC
DISTRIBUTION, INC.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:10-cv-01877)

*Thomas L. Feher* argued the cause for appellant.  With him on the briefs was *C. Dennis Southard*, *IV*.

*Levi S. Zaslow* argued the cause for appellee.  With him on the brief was *Steven B. Vinick*.

Before: ROGERS and TATEL, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: A Florida resident retained lawyers in an Ohio law firm's District of Columbia office to represent him in a matter pending in Oregon. When the client refused to pay for services rendered, the firm sued in the United States District Court for the District of Columbia, and the court dismissed the case for lack of personal jurisdiction. Because neither the retainer itself nor anything about the client's dealings with the law firm demonstrates that the client "purposefully avail[ed] [him]self of the privilege of conducting activities within the [District]," *Hanson v. Denckla*, 357 U.S. 235, 253 (1958), we affirm.

**I.**

Appellant Thompson Hine LLP, an Ohio-based law firm, has an office in the District of Columbia. Appellee Elicko Taieb, a Florida resident, was, at the time of the events leading up to this case, the majority owner, president, and CEO of Smoking Everywhere, Inc. (SEI), a Florida corporation with its principal place of business in Florida. Prior to its bankruptcy, SEI imported and distributed electronic cigarettes.

In March 2009, SEI retained Thompson Hine to handle a matter pending before the Food and Drug Administration (FDA). *Thompson Hine LLP v. Smoking Everywhere, Inc.*, 840 F. Supp. 2d 138, 140 (D.D.C. 2012). Written on Atlanta office letterhead, the retainer was signed by Walt Linscott, an attorney in the firm's Atlanta office, and provided Linscott's billing rate. Taieb was not a party to the retainer. Under Linscott's supervision, two attorneys in the firm's D.C. office, Kip Schwartz and Eric Heyer, performed most of the work on the FDA matter. Taieb met with Schwartz, Heyer, and Linscott in the D.C. office to discuss the matter prior to attending a court hearing. In the end, Thompson Hine's work was apparently successful, as it obtained a preliminary injunction against the FDA. *Id.* at 146.

Later that year, the firm entered into a second retainer—"the Oregon retainer"—this time with both SEI and Taieb, pertaining to an action brought against them by the Attorney General of Oregon alleging violations of the state's Unlawful Trade Practices Act. Taieb signed this retainer in his individual capacity. Addressed to Ray Story, SEI's vice president, the Oregon retainer, though written by Schwartz on the firm's D.C. office letterhead, was faxed from Atlanta. The retainer included contact information for Linscott, provided billing rates for Schwartz, Heyer, and another D.C.-based attorney, and specified that the firm would deposit the $10,000 retainer in a special account designated under Ohio law. According to their declarations, Schwartz and Heyer performed all work on the Oregon matter in the firm's D.C. office and "exchanged at least ten emails related to the FDA action and the Oregon action." Decl. of Eric Heyer 2.

Thompson Hine billed SEI and Taieb $480,000 for the work on both matters. After paying the firm some $100,000, they stiffed it for the rest. The firm then filed suit in the United States District Court for the District of Columbia against both SEI and Taieb. Attached to the complaint was Thompson Hine's final bill for both the FDA and Oregon matters. Written on Atlanta office stationary, the bill identifies Linscott as the supervising attorney and lists nineteen outstanding invoices for work on the two matters.

SEI and Taieb moved to dismiss for lack of personal jurisdiction, arguing that they had "little or no contacts with the District of Columbia." Mem. in Supp. of Defs.' Mot. to Dismiss 8. The district court, finding the parties' briefs largely conclusory, carefully and thoroughly reviewed the record in light of factors the courts have established for determining whether a non-resident's contacts with the forum are sufficient to ensure that "the maintenance of the suit does not offend

traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted). The record includes the FDA and Oregon retainers, Thompson Hine's final bill, declarations by Schwartz, Heyer, and Taieb, and records from the FDA litigation. Calling this a "close case," and finding that Thompson Hine "ha[d] not met its burden to prove that the Court has personal jurisdiction over either defendant," the district court dismissed the complaint. *Thompson Hine*, 840 F. Supp. 2d at 147–49.

Thompson Hine appeals. Because SEI is now bankrupt, the firm presses this appeal only against Taieb. *See Thompson Hine, LLP v. Smoking Everywhere, Inc.*, No. 12-7009 (D.C. Cir. July 26, 2012) (Order Dismissing Appeal). We review de novo the district court's dismissal for lack of personal jurisdiction. *FC Investment Group LC v. IFX Markets, Ltd.*, 529 F.3d 1087, 1091 (D.C. Cir. 2008).

## II.

"To establish personal jurisdiction over a non-resident, a court must . . . first examine whether jurisdiction is applicable under the state's long-arm statute and then determine whether a finding of jurisdiction satisfies the constitutional requirements of due process." *GTE New Media Services, Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000). Under the District of Columbia's long-arm statute, courts located in the District may exercise personal jurisdiction over any individual who "transact[s] any business in the District of Columbia." D.C. Code § 13-423. Because we have interpreted these words "to provide jurisdiction to the full extent allowed by the Due Process Clause[,] the statutory and constitutional jurisdictional questions, which are usually distinct, merge into a single inquiry": would exercising personal jurisdiction accord with the demands of due process? *United States v.*

*Ferrara*, 54 F.3d 825, 828 (D.C. Cir. 1995). A court's jurisdiction over a defendant satisfies due process when there are "minimum contacts," *International Shoe*, 326 U.S. at 316, between the defendant and the forum "such that he should reasonably anticipate being haled into court there," *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). Such minimum contacts must show that "the defendant purposefully avail[ed] [him]self of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson*, 357 U.S. at 253.

Two decisions guide our resolution of this case. The first, *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985), involved a suit by Burger King, a Florida corporation, against a Michigan franchisee who had signed a 20-year contract with Burger King. In considering whether the Florida court had personal jurisdiction over the Michigan franchisee, the Supreme Court began by making clear that an individual's contract with a non-resident "alone" cannot "automatically establish sufficient minimum contacts in the other party's home forum." *Id.* at 478 (internal citations omitted). The Court also rejected "mechanical tests," adopting instead a "highly realistic" approach that examines "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" to determine "whether the defendant purposefully established minimum contacts within the forum." *Id.* at 479 (internal citations and quotation marks omitted). The contacts with the forum, the Court explained, must "proximately result from actions by the defendant *himself* that create a 'substantial connection' with the forum State." *Id.* at 475 (internal citations omitted). "Thus, where the defendant 'deliberately' has engaged in significant activities within a State or has created 'continuing obligations' between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there"

such that "it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well." *Id.* at 475–76 (internal citations omitted).

Applying these principles, the Supreme Court concluded that the franchisee had "established a substantial and continuing relationship with Burger King's Miami headquarters [and] received fair notice from the contract documents and the course of dealing that he might be subject to suit in Florida." *Id.* at 487. The franchisee had deliberately "reached out . . . and negotiated with a Florida corporation" and voluntarily entered into "a carefully structured 20-year relationship that envisioned continuing and wide-reaching contacts." *Id.* at 479–480 (internal citations and quotation marks omitted). In addition to paying Burger King a substantial fee, the franchisee had "agree[d] to submit to [Burger King's] exacting regulation of virtually every conceivable aspect of [its] operations." *Id.* at 465. Specifically, from its offices in Miami Burger King had imposed a series of specific requirements on its franchisees relating to, among other things, accounting and insurance practices, hours of operation, and building layout, as well as the quality, appearance, and taste of menu items. *Id.* at 465 n.4. Moreover, "various franchise documents provid[ed] that all disputes would be governed by Florida law." *Id.* at 481. "[W]hen combined with the 20-year interdependent relationship [the franchisee] established with Burger King's Miami headquarters," these choice-of-law provisions "reinforced his deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there." *Id.* at 482. Finding that "the 'quality and nature' of [the franchisee's] relationship to the company in Florida can in no sense be viewed as 'random,' 'fortuitous,' or 'attenuated,'" *id.* at 480 (quoting *Hanson*, 357 U.S. at 253), the Court concluded that the

"exercise of jurisdiction . . . did not offend due process," *id.* at 487.

The second case, this Court's decision in *Health Communications, Inc. v. Mariner Corp.*, 860 F.2d 460 (D.C. Cir. 1988), involved a Texas hotel management firm that had retained the services of a District of Columbia-based company to provide training to its employees. Following more than eight months of telephone conversations and correspondence, the parties signed a contract pursuant to which the D.C. company conducted four workshop sessions in several locations outside the District. *Id.* at 462. The D.C. company also distributed manuals, graded exams, issued certificates, and corresponded with the Texas firm—all from its District office. *Id.* When the Texas firm failed to pay for the training services, the D.C. firm sued, and the district court dismissed the case for lack of personal jurisdiction over the Texas firm. *Id.* We affirmed, concluding that the parties' relationship was "narrowly specialized" and that the D.C. company's activities in the District "[did] not begin to approach, in either scope or importance, those that Burger King performed in Florida on behalf of its out-of-state franchisee." *Id.* at 463–64. Thus, the Texas firm never "'avail[ed] itself of the privilege of conducting activities within the forum.'" *Id.* at 464 (quoting *Hanson*, 357 U.S. at 253).

With *Burger King* and *Health Communications* in mind, we return to the retainers at issue in this case. As Thompson Hine concedes, because Taieb was not a party to the FDA retainer and because this appeal no longer concerns SEI, the only question before us is whether personal jurisdiction is proper over Taieb with respect to the Oregon matter. Thompson Hine nonetheless insists that the FDA matter remains relevant because "[d]uring the course of the FDA action, Taieb . . . developed a relationship" with Schwartz and

Heyer, whom he later "reached out to and retained" for the Oregon matter. Appellant's Br. 15. But as the district court found, "the only two meetings that took place in the District in connection with [the FDA] engagement were actually meetings with [Linscott]," and Schwartz and Heyer simply "assist[ed] him." *Thompson Hine*, 840 F. Supp. 2d at 147. Any "relationship" that Taieb developed during the FDA matter was therefore with Thompson Hine and Linscott, not with the firm's D.C.-based lawyers, whose names appear nowhere in the FDA retainer, and nothing in this "relationship" demonstrates that Taieb "purposefully directed his activities at residents of the forum." *Burger King*, 471 U.S. at 472 (internal quotation marks omitted). We therefore agree with the district court that "the showing for [personal] jurisdiction as to [Taieb] turns almost exclusively on his execution of the second engagement letter"—the Oregon retainer. *Thompson Hine*, 840 F. Supp. 2d at 148.

Taieb argues that even the Oregon retainer provides no basis for personal jurisdiction because his signature on it was forged. Appellee's Br. 7 n.3. But asked at oral argument where Taieb had made this argument in the district court, counsel pointed only to a line in Taieb's affidavit that says nothing at all about forgery. *See* Decl. of Elicko Taieb ¶ 9 ("I did not sign any contracts with the plaintiff in this matter within the District of Columbia or in Atlanta, Georgia."). The argument is therefore forfeited. *See Meijer, Inc. v. Biovail Corp.*, 533 F.3d 857, 867 (D.C. Cir. 2008) ("Absent a showing that 'injustice might otherwise result,' and the plaintiffs offer none, we do not entertain an argument made for the first time on appeal.") (internal citations omitted).

According to Thompson Hine, the Oregon retainer on its own is enough to establish "minimum contacts" with the District because it demonstrates that Taieb "knowingly

retained" D.C. lawyers whom he had "reason to know" would work in the District. Appellant's Br. 14–15. But as *Burger King* makes clear, in evaluating whether a contract establishes "minimum contacts" we must look beyond the mere existence of the contract to the parties' "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing," 471 U.S. at 479, paying particular attention to whether "actions by the defendant *himself*," *id.* at 475, demonstrate that he "purposefully availed himself of the benefits" of conducting business in the forum, *id.* at 488 (internal quotations omitted). Viewed through that lens, Taieb's engagement of Thompson Hine falls short of establishing the requisite "minimum contacts" with the District. For one thing, the retainer, which Taieb signed outside the District, pertains to a matter in Oregon, and nothing in the retainer itself requires that the firm perform work or receive payment in the District. Further, Linscott supervised the Oregon matter from Atlanta and although we must credit Schwartz and Heyer's statements that they performed their work in the District, the record contains no evidence of any meetings, phone calls, or emails between Taieb and the firm's D.C.-based lawyers concerning the Oregon matter, other than Heyer's vague statement that he "exchanged at least ten emails [with Taieb] related to [both] the FDA action and the Oregon action." Decl. of Eric Heyer ¶ 9. Nor does the retainer contain a choice-of-law provision or provide for consent to suit in the District. "While such provisions are clearly not dispositive under *Burger King*, their presence can be indicative of the parties' own perceptions of their degree of contact with a particular forum." *Health Communications*, 860 F.2d at 464 n.2. Finally, according to the invoice dates, Taieb's engagement of Thompson Hine pursuant to the Oregon retainer lasted at most seven months. Not only is this shorter than the arrangement in *Health Communications* and a small fraction of the duration of the

franchise agreement in *Burger King*, but the entire relationship between Taieb and Thompson Hine reflects none of the "continuing and wide-reaching" contacts that provided a basis for personal jurisdiction in *Burger King*. *See Burger King*, 471 U.S. at 480. Quite to the contrary, the Oregon matter is far more like the "narrowly specialized" association at issue in *Health Communications*. Besides signing the Oregon retainer, neither Taieb's own conduct nor the retainer's "contemplated future consequences," *Burger King*, 471 U.S. at 479, "touched the District in any way," *Health Communications*, 860 F.2d at 464. To be sure, Schwartz and Heyer worked on the Oregon matter from their offices in the District of Columbia, but the D.C.-based company in *Health Communications* also performed work in the District. Echoing *Health Communications*, we therefore "cannot say that [Taieb] 'avail[ed] [him]self of the privilege of conducting activities within the forum." *Id.* at 464 (quoting *Hanson*, 357 U.S. at 253).

Thompson Hine, which did not get around to citing *Burger King* until its reply brief and never even acknowledges *Health Communications*, instead relies on a series of decisions by various courts of the District of Columbia that it claims "have universally held that personal jurisdiction exists over a nonresident who knowingly retains District of Columbia counsel who will perform legal services for the nonresident in the District." Appellant's Br. 16. But in two of these cases, both federal court decisions, the contacts were far more extensive than those between Taieb and Thompson Hine. *See Koteen v. Bermuda Cablevision, Ltd.*, 913 F.2d 973, 975 (D.C. Cir. 1990) (upholding exercise of personal jurisdiction over non-resident who retained plaintiff D.C. law firm, visited firm multiple times, and "extensively communicat[ed] with it by telephone and by mail"); *Law Offices of Jerris Leonard P.C. v. Mideast Sys., Ltd.*, 630 F. Supp. 1311, 1313 (D.D.C. 1986)

(retaining personal jurisdiction over non-residents who had multiple meetings with plaintiff D.C. lawyers in the District, where alleged fraud took place).

The other decisions Thompson Hine cites all come from the D.C. Court of Appeals. We certainly understand why Thompson Hine relies on them, as they are highly protective of law firms based in the District of Columbia, sustaining the exercise of personal jurisdiction even when contacts between the law firm and client are slim. The first case, *Mouzavires v. Baxter*, 434 A.2d 988 (D.C. 1981) (en banc), involved a Florida law firm that hired a D.C. patent attorney to assist in a matter pending in Florida. Although the parties agreed that the D.C. attorney would work primarily in the District, they had few other contacts. The D.C. Court of Appeals nonetheless found the exercise of personal jurisdiction appropriate because the Florida law firm had "voluntarily initiated, and entered into, a contract with one they knew to be located in the District and engaged in a transaction which had a substantial connection with the District and which they foresaw would have consequences here." *Id.* at 997. The contacts in *Digital Broadcast Corp. v. Rosenman & Colin, LLP*, 847 A.2d 384 (D.C. 2004), were even more limited. There, a non-resident company that retained a D.C.-based attorney specializing in securities regulation had no additional contact with the District. Again sustaining the exercise of personal jurisdiction over the non-resident, the Court of Appeals considered the case essentially indistinguishable from its previous decision in *Fisher v. Bander*, 519 A.2d 162 (D.C. 1986), where it had upheld the exercise of personal jurisdiction over a non-resident company that had purposefully solicited and retained D.C. counsel specializing in matters before the Federal Communications Commission and attended just one meeting in the District. *See Digital Broadcast Corp.*, 847 A.2d at 391; *see also Fisher*, 519 A.2d 162, 164–65 (D.C. 1986).

Thompson Hine argues that *Mouzavires*, *Digital Broadcast*, and *Fisher* establish that personal jurisdiction over a non-resident is proper where, as here, the non-resident deliberately retained D.C. counsel and should therefore have anticipated that services would be performed in the District. But in exercising jurisdiction over defendants with such limited relationships to the District, these cases—or at least Thompson Hine's characterization of them—appear to have adopted the very kind of "mechanical test" that *Burger King* expressly rejected. In essence, they allow a contract with a non-resident to "automatically" qualify as a "minimum contact" without examining whether contacts arising either from the contract itself or from actual dealings between the parties demonstrated that the non-resident "purposefully avail[ed] [him]self of the privilege of conducting activities within the forum State." 471 U.S. at 475 (quoting *Hanson*, 357 U.S. at 253). To be clear, under some circumstances the terms of a contract may well create such a "substantial connection" between the non-resident and the forum that the contract "alone" could supply the necessary "minimum contacts." *Id.* at 475–76. The "wide-reaching" and "exacting" franchise agreement in *Burger King* did just that. *Id.* at 480; *see also McGee v. International Life Insurance Co.*, 355 U.S. 220, 223 (1957) (holding that "Due Process Clause did not preclude the California court from entering a judgment" against a Texas company when "the suit was based on a contract which had substantial connection with that State"). But this is a very different case. As explained above, neither the Oregon retainer nor Taieb's dealings with Thompson Hine demonstrates that Taieb "purposefully avail[ed] [him]self of the privilege of conducting activities" in the District. *Burger King*, 471 U.S. at 475 (internal quotation marks and citations omitted). Taieb's mere retention of attorneys in the District of Columbia is insufficient. As we put it in *Health Communications*, "a purchaser who selects an out-of-state seller's goods or services

based on their economic merit does not thereby purposefully avail itself of the seller's state law [or] submit to the laws of the jurisdiction in which the seller is located." 860 F.2d at 465; *accord Hanson*, 357 U.S. at 253 ("The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State.").

We therefore disagree with Thompson Hine that the district court had personal jurisdiction over Taieb simply because the firm performed work for him in the District. As the D.C. Court of Appeals itself explained in a pre-*Mouzavires* case, that position would effectively "remove any protection which the due process clause affords a nonresident defendant." *Environmental Research International, Inc. v. Lockwood Greene Engineers, Inc.*, 355 A.2d 808, 812 (D.C. 1976) (en banc). In language seemingly tailor-made for this case, the court continued, "The mere fact that a nonresident has retained the professional services of a District of Columbia firm, thereby setting into motion the resident party's own activities within this jurisdiction, does not constitute an invocation by the nonresident of the benefits and protections of the District's laws." *Id.* Indeed, the dissent in *Mouzavires* concluded—properly in our view—that this language "should have been dispositive." 434 A.2d at 1002 (Newman, C.J., dissenting).

In sum, after examining the "quality and nature of [Taieb's] activities," we agree with the district court that he never "purposefully avail[ed] [him]self of the privilege of conducting activities" within the District. *Hanson*, 357 U.S. at 253. A non-resident's mere retention of a D.C.-based service provider, absent any other deliberate contact with the forum—demonstrated either by the terms of the contract itself or by the non-resident's actual dealings with the

District—cannot qualify as a "minimum contact." If Taieb's engagement of Thompson Hine were sufficient to subject him to the personal jurisdiction of the courts of the District of Columbia, "then it is hard to imagine that anyone entering into a contract for the provision of goods or services by an out-of-state party could avoid being haled into court in the seller's forum." *Health Communications*, 860 F.2d at 463.

## III.

For the foregoing reasons, we affirm.

*So ordered.*