# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Submitted April 17, 2020        Decided June 30, 2020

No. 19-7116

NICOLE URQUHART-BRADLEY,
APPELLANT

v.

SHAWN MOBLEY,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:18-cv-02213)

*Deborah K. Marcuse* and *Austin L. Webbert* were on the briefs for appellant.

*Karla Grossenbacher* and *Leslie V. Maffeo* were on the brief for appellee.

Before: SRINIVASAN, *Chief Judge*, GARLAND and MILLETT, *Circuit Judges*.[1]

Opinion for the Court filed by *Circuit Judge* MILLETT.

---

[1] This appeal was considered on the briefs of the parties. *See* FED. R. APP. P. 34(a)(2); D.C. CIR. R. 34(j).

MILLETT, *Circuit Judge*: The district court dismissed Nicole Urquhart-Bradley's claims of employment discrimination against Shawn Mobley, Cushman & Wakefield's Chief Executive Officer of the Americas, for lack of personal jurisdiction. The court relied on the so-called "fiduciary shield doctrine" to exclude from its jurisdictional analysis any contacts with the District of Columbia that Mobley made in his capacity as Chief Executive Officer of the Americas.

Because the fiduciary shield doctrine lacks any basis in either the Due Process Clause or the transacting-business prong of the District of Columbia's long-arm statute, D.C. CODE § 13-423(a)(1), and because the district court's dismissal erroneously denied Urquhart-Bradley's request in the alternative for limited jurisdictional discovery, we vacate and remand. On remand, the district court may either (i) determine on the current record that Mobley's suit-related contacts (made in his capacity as Chief Executive Officer of the Americas and otherwise) satisfy the minimum-contacts standard, or (ii) grant jurisdictional discovery to permit development of the record on Mobley's contacts with the District of Columbia.

**I**

**A**

Cushman & Wakefield, Inc., is a real estate firm headquartered in Chicago, Illinois, with locations around the world, including in the District of Columbia.[2]

---

[2] At the motion to dismiss stage, we accept as true all of the complaint's relevant allegations of fact and draw all reasonable inferences in favor of the plaintiff. *See Singletary v. Howard Univ.*, 939 F.3d 287, 295, 302 (D.C. Cir. 2019).

Nicole Urquhart-Bradley is an African American woman who resides in Columbia, Maryland. Urquhart-Bradley was hired in 2003 to manage the Valuation and Advisory Practice Group ("Valuation Group") in Cushman & Wakefield's District of Columbia office.

Urquhart-Bradley was promoted several times over the ensuing years. Most recently, in mid-2016, she was given the title of President of the Valuation Group for the Americas. Urquhart-Bradley's white male predecessor in that same position held the title of President of the Global Valuation Group. He left Cushman & Wakefield in August 2016 to start a Valuation Group for a competitor. When Urquhart-Bradley took over his duties, she was given only the lesser title of President of the Valuation Group for the Americas. According to Urquhart-Bradley, that reduction in title fit squarely within Cushman & Wakefield's "pattern and practice of refusing to offer female executives global titles." J.A. 7.

In June 2017, Urquhart-Bradley began getting calls from recruiters and competitor firms about employment opportunities. She told her direct superior about the calls. He gave her permission to meet with two of the firms to determine whether they were planning to launch competitive practices. Neither of those firms had their own Valuation and Advisory divisions.

That August, Urquhart-Bradley's predecessor began recruiting approximately 100 Cushman & Wakefield Valuation Group employees to join him at the competing practice he had started. As President of the Valuation Group for the Americas, Urquhart-Bradley worked tirelessly to fend off that "[s]iege," and ultimately succeeded in retaining more than two-thirds of the employees that her predecessor had targeted. J.A. 8. During that time, Cushman & Wakefield

approved about $14 million in retention bonuses for members of the Valuation Group.

When the smoke began to clear in early December 2017, Urquhart-Bradley scheduled a meeting with Cushman & Wakefield's new Chief Executive Officer for the Americas, Shawn Mobley, to discuss her future at the firm. Mobley works and resides in Illinois, where Cushman & Wakefield is headquartered.

At the meeting, Mobley asked Urquhart-Bradley if she had received job offers from competitor firms. She told him that she had—from one of the firms with which her supervisor had authorized her to speak. But she then "affirmed that she wanted to stay at" Cushman & Wakefield. J.A. 10. She also "explained that she would not seek a monetary retention bonus." J.A. 10. That was notable given how frequently Cushman & Wakefield had been paying such bonuses at that time to retain employees. For example, in addition to the bonuses offered during the siege, Urquhart-Bradley's predecessor had been offered a $3 million retention bonus after announcing that he would be leaving to start a competitive practice. Instead of seeking a bonus, Urquhart-Bradley asked Mobley "to build certain protections into her contract in the event of further changes in reporting or organization." J.A. 10.

Around this time, Mobley named Urquhart-Bradley to his Executive Leadership team. Urquhart-Bradley responded in an email to Mobley on December 14, 2017, expressing her appreciation for that designation. She also passed along protective "contract language that [Cushman & Wakefield] previously approved for employees on her leadership team * * * and suggested that the language in her own contract be enhanced" because those employees had received six- and

seven-figure retention bonuses (which she was not seeking)." J.A. 10.

Mobley did not respond to Urquhart-Bradley's email. A few days later, Urquhart-Bradley flew to Chicago to attend Executive Leadership meetings with Mobley. But before they began, Urquhart-Bradley got what she describes as a "hostile" call from Mobley in which he demanded that she "decide" whether to leave Cushman & Wakefield for another firm. J.A. 11. Urquhart-Bradley "reiterated that she was committed to staying[.]" J.A. 11. Mobley then "[a]ngrily" "disinvited [her] from the Executive Leadership dinner[,]" which was taking place that evening in Chicago, "and told her he would call her to continue the conversation that evening." J.A. 11. In lieu of a call, Mobley sent Urquhart-Bradley an email "wishing her safe travels home (in other words, telling [her] that she would not be attending the meeting[s] of the Executive Leadership team)," and advising her that the two of them would speak later in the week. J.A. 11.

A few days later, Mobley called Urquhart-Bradley to tell her that he and others had lost confidence in her, and that she should start looking for another job. "In shock," she told Mobley "that she would not leave [Cushman & Wakefield] voluntarily." J.A. 11.

Mobley ignored Urquhart-Bradley's efforts to reach him over the next week. Then, on January 5, 2018, Mobley fired her over the telephone.

Urquhart-Bradley subsequently heard from a supervisor and others that "Mobley claimed, falsely, that [Cushman & Wakefield] had terminated her because she had been negotiating a contract with a competitor." J.A. 12. Urquhart-Bradley insists that she never negotiated a contract with any company, let alone a competitor. She adds that, even if she

had, Cushman & Wakefield had offered her white male predecessor a $3 million retention bonus after he had already signed a contract and accepted a position with a competitor. On a subsequent call with the Valuation Group team, after Urquhart-Bradley was fired, her supervisor allegedly falsely circulated a still different reason for her departure: That she and Cushman & Wakefield had mutually parted ways.

**B**

In September 2018, Urquhart-Bradley filed this suit in the United States District Court for the District of Columbia asserting claims of race and gender discrimination against both Mobley and Cushman & Wakefield.

With respect to Mobley as an individual defendant, Urquhart-Bradley asserts in her amended complaint claims of (i) race discrimination in violation of 42 U.S.C. § 1981, and (ii) aiding and abetting race and gender discrimination in violation of the District of Columbia Human Rights Act, D.C. CODE §§ 2-1401 *et seq.*

Mobley moved to dismiss Urquhart-Bradley's claims against him. He argued that his contacts with the District of Columbia were insufficient for the district court to exercise personal jurisdiction over him. Mobley emphasized the complaint's recognition that he was a resident of Illinois and the absence of any allegation that he was "in the District of Columbia on a single occasion." Memorandum in Support of Motion to Dismiss at 2, 5, *Urquhart-Bradley v. Cushman & Wakefield, Inc.*, No. 1:18-cv-02213-RCL (D.D.C. Feb. 11, 2019), ECF No. 25-1. And while Cushman & Wakefield had plenty of suit-related contacts with the District of Columbia, Mobley contended that those contacts could not be imputed to him in his *individual* capacity. Nor, Mobley argued, did any actions he took "solely in a corporate capacity" count. *Id.* at 5.

Invoking the fiduciary shield doctrine, Mobley insisted that only those actions he took "outside the scope of his employment" were relevant to the minimum contacts analysis. *Id.*

Urquhart-Bradley saw things differently. To begin with, she argued that Cushman & Wakefield's contacts with the District of Columbia could be imputed to Mobley. J.A. 33–34. But even if they could not, she disputed on two grounds Mobley's invocation of the fiduciary shield doctrine. J.A. 29.

First, she argued that "recent cases have thrown the fiduciary shield doctrine into question more broadly." J.A. 32. There was no dispute, she noted, that the transacting-business prong of the District of Columbia's long-arm statute, D.C. CODE § 13-423(a)(1), authorized jurisdiction as far as permitted under the Due Process Clause. J.A. 32–35. And a growing number of federal courts had "come to question whether the [fiduciary shield] doctrine exists under the Due Process Clause at all." J.A. 33 (citing *Newsome v. Gallacher*, 722 F.3d 1257, 1275–1276 (10th Cir. 2013)).

Second, she argued that even if the doctrine generally had purchase, an exception applied because Mobley was "more than an employee" of Cushman & Wakefield given the "'significant influence' and 'involvement'" he had in Urquhart-Bradley's discriminatory treatment. J.A. 29–30 (quoting *National Cmty. Reinvestment Coal. v. NovaStar Fin., Inc.*, 631 F. Supp. 2d 1, 8 (D.D.C. 2009)).

Setting aside the fiduciary shield doctrine, Urquhart-Bradley continued, Mobley had ample suit-related contacts with the District of Columbia to support specific personal jurisdiction. J.A. 33. As Chief Executive Officer of the Americas, Mobley personally transacted "significant business" in the District of Columbia by overseeing Cushman &

Wakefield's "operations and employees" there, including his supervision of Urquhart-Bradley. J.A. 35. The complaint alleges that Mobley had numerous, relevant contacts with Urquhart-Bradley over telephone and email while she was working in the District of Columbia. Eventually, he even "reached into the District of Columbia" by telephone "to discriminatorily terminate" her and "replace her with a less qualified white male." J.A. 26.

If those contacts were not sufficient, Urquhart-Bradley argued in the alternative that she be permitted "the opportunity to conduct limited jurisdictional discovery" into Mobley's suit-related contacts. J.A. 28 n.3 (formatting modified). Specifically, she asserted that discovery would yield supplemental information about Mobley's contacts with the District of Columbia involving both "his role in leading the Company's business activities [there], and his involvement in the discriminatory employment actions taken against Urquhart-Bradley." J.A. 28 n.3 (formatting modified).

The district court granted Mobley's motion to dismiss. The court agreed with Mobley that the fiduciary shield doctrine applied, so that any actions he took "squarely within [a corporate officer's] scope of employment" were irrelevant to the minimum contacts analysis. J.A. 41 (formatting modified). In the district court's view, the only contact alleged here between Mobley and the forum was his "calling from outside the jurisdiction to fire [Urquhart-Bradley]." J.A. 41. The district court decided that fact was insufficient to confer personal jurisdiction, noting that "Urquhart-Bradley never allege[d]" that it exceeded "Mobley's corporate responsibilities." J.A. 41. Concluding that Urquhart-Bradley had failed to allege any suit-related contacts that "exceeded [Mobley's] corporate responsibilities," the district court held that it lacked personal jurisdiction over him. J.A. 42.

The district court's decision did not mention Urquhart-Bradley's request for jurisdictional discovery.

The district court subsequently granted Urquhart-Bradley's unopposed motion to enter final judgment on her claims against Mobley. *See* FED. R. CIV. P. 54(b).

Urquhart-Bradley filed a timely notice of appeal.

## II

The district court exercised subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332(a), and 1367. Our jurisdiction arises under 28 U.S.C. § 1291.

We review *de novo* the district court's dismissal for lack of personal jurisdiction. *Livnat v. Palestinian Auth.*, 851 F.3d 45, 48 (D.C. Cir. 2017). We review for abuse of discretion the denial of jurisdictional discovery. *Id.*

## III

### A

A complaint can establish a basis for personal jurisdiction in two ways.

First, it can show "general or all-purpose jurisdiction," which permits a court to "hear any and all claims against" the defendant. *Shatsky v. Palestine Liberation Org.*, 955 F.3d 1016, 1036 (D.C. Cir. 2020) (internal quotation marks omitted). Where the defendant is an individual, "the paradigm forum for the exercise of general jurisdiction is the individual's domicile[.]" *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011).

Mobley resides in Illinois, not the District of Columbia. And Urquhart-Bradley disclaims any argument that general jurisdiction over him exists in the District of Columbia. Urquhart-Bradley Br. 35 n.8. We agree that the complaint provides no basis for an exercise of general personal jurisdiction.

Second, a complaint can allege "specific or conduct-linked jurisdiction." *Shatsky*, 955 F.3d at 1036 (internal quotation marks omitted). This requires determining both that (i) jurisdiction is permissible under the forum state's long-arm statute, and (ii) the exercise of personal jurisdiction comports with the Due Process Clause. *See Thompson Hine, LLP v. Taieb*, 734 F.3d 1187, 1189 (D.C. Cir. 2013); *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471–472 (1985) ("The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which [the individual] has established no meaningful contacts, ties, or relations.") (internal quotation marks omitted).

In this case, those "statutory and constitutional" predicates for specific personal jurisdiction "merge into a single inquiry[.]" *Thompson Hine*, 734 F.3d at 1189 (internal quotation marks omitted). That is because Urquhart-Bradley invokes the provision of the District of Columbia's long-arm statute that reaches any individual "transacting any business in the District of Columbia," D.C. CODE § 13-423(a)(1), which provides "jurisdiction to the full extent allowed by the Due Process Clause," *Thompson Hine*, 734 F.3d at 1189 (quoting *United States v. Ferrara*, 54 F.3d 825, 828 (D.C. Cir. 1995)).[3]

---

[3] In light of our disposition, we have no occasion to address Urquhart-Bradley's alternative argument that jurisdiction would be proper under the prong of the District of Columbia's long-arm statute that addresses "tortious injury in the District of Columbia [caused]

11

In turn, a court's exercise of personal jurisdiction over a defendant satisfies due process if there are "minimum contacts" between the defendant and the forum such that the defendant "should reasonably anticipate being haled into court there[.]" *Thompson Hine*, 734 F.3d at 1189 (internal quotation marks omitted). That is, there must exist "a relationship among the defendant, the forum, and the litigation" such that "the defendant's suit-related conduct * * * create[s] a substantial connection with the forum." *Shatsky*. 955 F.3d at 1036 (internal quotation marks omitted).

**B**

The central question in this case is whether the district court conducted a flawed minimum contacts analysis by excluding any suit-related conduct that Mobley himself undertook just because it fell within the scope of his corporate responsibilities. In other words, did the district court err in applying what is known as the "fiduciary shield doctrine," which provides that "a nonresident corporate agent generally is not individually subject to a court's jurisdiction based on acts undertaken on behalf of the corporation?" 3A William Meade Fletcher et al., Fletcher Cyclopedia of the Law of Corporations § 1296.20 (updated September 2019). Because the fiduciary shield doctrine has no home in either the Due Process Clause or the coextensive prong of the District of Columbia's long-arm statute, we reverse and remand for further proceedings.

**1**

At the outset, Mobley asserts that Urquhart-Bradley forfeited her challenge to the fiduciary shield doctrine's

by an act or omission outside the District." *See* Urquhart-Bradley Br. 56 (quoting D.C. Code § 13-423(a)(4)).

consistency with the Due Process Clause and the District of Columbia's long-arm statute by failing to make the argument in district court.  Mobley Br. 5.  That is incorrect.

Urquhart-Bradley adequately preserved her challenge to the fiduciary shield doctrine in district court.  In her opposition to Mobley's motion to dismiss, Urquhart-Bradley noted that the transacting-business prong of the District of Columbia's long-arm statute is "coextensive" with the Due Process Clause, J.A. 32, 34–35 (formatting modified), and argued that a "growing number of courts * * * have come to question whether the [fiduciary shield] doctrine exists under the Due Process Clause at all," J.A. 33.  She then cited the Tenth Circuit's "holding that 'the fiduciary shield doctrine does not enjoy constitutional status' and 'has no necessary connection to the minimum contacts analysis.'"  J.A. 33 (quoting *Newsome*, 722 F.3d at 1275–1276).  Those arguments put the district court on fair notice "as to the substance of the issue" she presses on appeal.  *Nelson v. Adams USA, Inc.*, 529 U.S. 460, 469 (2000).

To be sure, Urquhart-Bradley primarily argued that an exception to the fiduciary shield doctrine applied, and that was reason enough not to discount the contacts Mobley made in his capacity as Chief Executive Officer of the Americas.  But that does not change the fact that her alternative argument directly challenging the fiduciary shield doctrine was also preserved.

**2**

Turning to the merits, Urquhart-Bradley is correct:  The fiduciary shield doctrine plays no role in personal jurisdiction analysis under either the Due Process Clause or the coextensive prong of the District of Columbia's long-arm statute.

With respect to the Due Process Clause, the Supreme Court has twice held that minimum contacts analysis considers actions taken by individuals in their role as corporate employees or officers.

*First*, in *Calder v. Jones*, 465 U.S. 783 (1984), a California entertainer brought a libel action in California Superior Court over the publication of an article in the National Enquirer, *id.* at 785, 788. She sued, among others, the Florida-based National Enquirer and two of its Florida-based employees who authored and edited the article. *Id.* at 785, 789. The employees argued that the California court lacked personal jurisdiction over them. *Id.*

In holding that personal jurisdiction was proper over the individual employees, the Supreme Court acknowledged that the offending article was actually published by their corporate employer. *Calder*, 465 U.S. at 789–790. But, the Court emphasized, "their status as employees does not somehow insulate them from jurisdiction." *Id.* at 790. "Each defendant's contacts with the forum State must be assessed individually." *Id.* To be sure, the employees' "contacts with California are not to be judged according to their *employer's* activities there." *Id.* (emphasis added). But that did not absolve the employees of the jurisdictional consequences of their own individual actions as employees that reached into the forum state. Because they were "primary participants in an alleged wrongdoing intentionally directed at a California resident," the Supreme Court held that the exercise of personal "jurisdiction over them [wa]s proper[,]" notwithstanding that they undertook those actions in their role as employees. *Id.* at 789–790.

*Second*, in *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984), a New York resident brought a libel suit in the United States District Court for the District of New Hampshire against

Hustler Magazine and Larry Flynt, its publisher, editor, and owner, *id.* at 781 n.13. In addressing personal jurisdiction, the Supreme Court reaffirmed that jurisdiction over Flynt turned not upon the jurisdictionally relevant actions of the business, but upon Flynt's individual contacts, professionally or otherwise, with the forum. *Id.* The Court rejected the notion that "employees who act in their official capacity are somehow shielded from suit in their individual capacity[,]" repeating *Calder*'s admonition that "[e]ach defendant's contacts with the forum State must be assessed individually." *Id.*

Under *Calder* and *Keeton*, the district court erred in its minimum contacts analysis by ignoring any suit-related conduct undertaken by Mobley himself just because it was part of his "corporate responsibilities." J.A. 41. The Supreme Court has flatly rejected—twice—"the suggestion that employees who act in their official capacity are somehow shielded from suit in their individual capacity," and so all of their suit-related contacts—professional and personal—factor into the personal jurisdiction analysis. *Keeton*, 465 U.S. at 781 n.13; *see Calder*, 465 U.S. at 790.

Following the Supreme Court's lead, we hold that, when evaluating under the Due Process Clause an individual's contacts with the forum state, courts cannot ignore contacts made by the individual just because they were made in his or her capacity as an employee or corporate officer. Contacts are contacts and must be counted. Said otherwise, the Due Process Clause does not incorporate the fiduciary shield doctrine.

In so holding, we join the judgment of every other federal court of appeals to have answered the question in the wake of *Calder* and *Keeton*. *See Newsome*, 722 F.3d at 1276 ("The fiduciary shield doctrine * * * has no necessary connection to the minimum contacts analysis."); *Hardin Roller Corp. v.*

*Universal Printing Mach., Inc.*, 236 F.3d 839, 842 (7th Cir. 2001) ("[T]he Constitution does not shield persons who act as corporate agents from individual-capacity suits.").[4]

With respect to the transacting-business prong of the District of Columbia's long arm statute, the fiduciary shield doctrine similarly finds no traction.

There is no question that, even though the fiduciary shield doctrine is not required by the Due Process Clause, the District of Columbia could choose to adopt such a limitation as a matter

---

[4] *See also Villa Marina Yacht Sales, Inc. v. Hatteras Yachts*, 915 F.2d 7, 10–12 (1st Cir. 1990) (resting personal jurisdiction on the defendant's actions taken "[a]s the corporate officer"); *Retail Software Servs., Inc. v. Lashlee*, 854 F.2d 18, 21–24 (2d Cir. 1988) (grounding the exercise of personal jurisdiction over individual defendants in part on actions made in a corporate capacity); *FlagHouse, Inc. v. ProSource Dev., Inc.*, 528 F. App'x 186, 189 & n.4 (3d Cir. 2013) (noting there is no basis for the fiduciary shield doctrine under the Due Process Clause "because the Supreme Court has held that it does not violate due process to find personal jurisdiction based solely on contacts made in an employee's official capacity"); *ePlus Tech., Inc. v. Aboud*, 313 F.3d 166, 177 (4th Cir. 2002) (relying on *Calder* to hold that an individual defendant "is not immune from jurisdiction in Virginia merely because her contacts with the Commonwealth were made ostensibly on behalf of" her employer); *Balance Dynamics Corp. v. Schmitt Indus., Inc.*, 204 F.3d 683, 698 (6th Cir. 2000) (holding "that the mere fact that the actions connecting defendants to the state were undertaken in an official rather than personal capacity does not preclude the exercise of personal jurisdictional over those defendants"); *Davis v. Metro Prods., Inc.*, 885 F.2d 515, 521–522 (9th Cir. 1989) (holding that *Calder* and *Keeton* preclude any application of the fiduciary shield doctrine under due process); *Williams Elec. Co. v. Honeywell, Inc.*, 854 F.2d 389, 391–392 (11th Cir. 1988) (rejecting the concept of a fiduciary shield doctrine in light of *Calder*).

of its own law. *See, e.g.*, *Newsome*, 722 F.3d at 1276 (noting that long-arm statutes can sweep less broadly than due process permits by independently adopting a fiduciary shield doctrine). But the District of Columbia plainly has not taken that route.

District law empowers courts within its borders to exercise personal jurisdiction over any individual who "transact[s] any business in the District of Columbia." D.C. CODE § 13-423(a)(1). The District of Columbia's courts have "repeatedly reaffirmed that the [transacting-business] provision of the District's Long Arm Statute is coextensive with the Due Process Clause of the Fifth Amendment." *Family Fed'n for World Peace v. Moon*, 129 A.3d 234, 242 (D.C. 2015) (formatting modified).

So have we. *See, e.g.*, *Thompson Hine*, 734 F.3d at 1189 ("[W]e have interpreted [the transacting-business prong of the District of Columbia's long-arm statute] to provide jurisdiction to the full extent allowed by the Due Process Clause.").

And Mobley agrees. *See* Mobley Br. 9 ("The [District of Columbia] long-arm statute is coextensive with the due process clause.") (internal quotation marks omitted); *see also* Mobley Br. 9 ("As such, the statutory and constitutional jurisdictional questions, which are usually distinct, merge into a single inquiry.") (internal quotation marks omitted).

To that same point, when District of Columbia courts discuss the fiduciary shield doctrine, they do so only in the context of construing what they perceive to be the outer limits of the Due Process Clause. *See Family Fed'n*, 129 A.3d at 242–244 (noting that the transacting-business prong goes as far as due process permits, and then discussing the fiduciary shield doctrine and finding it inapplicable and difficult to reconcile with *Calder*); *Daley v. Alpha Kappa Alpha Sorority, Inc.*, 26 A.3d 723, 727–728 & n.3 (D.C. 2011) (same); *Flocco v. State*

*Farm Mut. Auto. Ins. Co.*, 752 A.2d 147, 162–164 & n.20 (D.C. 2000) (noting that the transacting-business prong goes as far as due process permits, and then applying a limited fiduciary shield doctrine based on a federal district court decision that itself had erroneously held that the Due Process Clause includes such a doctrine) (discussing *Wiggins v. Equifax, Inc.*, 853 F. Supp. 500, 503 (D.D.C. 1994)). That is how Mobley describes those decisions as well. *See* Mobley Br. 22 ("While rejecting an absolute fiduciary shield, the [District of Columbia] Court of Appeals has repeatedly applied a limited fiduciary shield *while analyzing cases under the Due Process Clause*.") (formatting modified). In short, the relevant prong of the District of Columbia's long arm statute reaches as far as the Constitution allows. It has no room for the fiduciary shield doctrine, which would shorten the District of Columbia's jurisdictional hand.

Because the fiduciary shield doctrine lacks any anchor in the Due Process Clause or the coextensive transacting-business prong of the District of Columbia's long-arm statute, the district court erred in refusing to consider Mobley's suit-related contacts undertaken in his corporate role, such as his personal firing of Urquhart-Bradley (over the telephone) from her position in the District of Columbia office that he oversaw. Those contacts count.

## C

Mobley argues that, even if the district court erred in applying the fiduciary shield doctrine, we should affirm on the alternative ground that his contacts were insufficient to support specific personal jurisdiction, even counting the actions he took within the scope of his employment. Mobley Br. 16. But Mobley's alleged contacts have far more heft than he recognizes.

For starters, Urquhart-Bradley alleges that Mobley personally reached into the District of Columbia (over the telephone) to fire her from her District-based employment. That act of termination—of ending an employment position within the District of Columbia—is central to Urquhart-Bradley's claims, and there is a fair argument that it alone is sufficient to support specific personal jurisdiction over Mobley. After all, minimum contacts exist where a defendant takes "intentional, and allegedly tortious, actions" "expressly aimed" at a jurisdiction. *Calder*, 465 U.S. at 789. And there is no argument at this stage that the defendant happened to cause effects in the District of Columbia because of some "fortuitous" or "unilateral" choice of the plaintiff's. *Walden v. Fiore*, 571 U.S. 277, 286 (2014) (internal quotation marks omitted). Mobley could hardly have fired Urquhart-Bradley from a role (or in a jurisdiction) other than the one in which she was employed.

And the termination call is not the only relevant contact alleged by Urquhart-Bradley. The complaint also alleges that Mobley (i) oversaw Cushman & Wakefield's District of Columbia office; (ii) had continuing contacts with that office and its employees, including numerous communications with Urquhart-Bradley; (iii) put the District of Columbia-based Urquhart-Bradley on his Executive Leadership team, and then retracted that role; and (iv) engaged in a series of adverse communications with her regarding her position at the company, culminating in him personally firing her for allegedly discriminatory reasons. *See* J.A. 9–12. So, for personal jurisdiction purposes, this case is about more than a single termination telephone call.

That said, because the district court has not yet had an opportunity to consider, freed of the fiduciary shield doctrine, whether all of Mobley's suit-related contacts are sufficient to

support personal jurisdiction, we remand that question for the district court's resolution in the first instance.

**D**

Finally, Urquhart-Bradley argues that, if the facts in the complaint do not already establish personal jurisdiction, then the district court abused its discretion in its *sub silentio* denial of her alternative request for jurisdictional discovery. We agree.

We have held many times that, "if a party demonstrates that it can supplement its jurisdictional allegations through discovery, then jurisdictional discovery is justified." *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1351–1352 (D.C. Cir. 2000) (citing *Crane v. Carr*, 814 F.2d 758, 760 (D.C. Cir. 1987)); *see also Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 513 (D.C. Cir. 2002) ("Because the plaintiff has demonstrated that it can supplement its jurisdictional allegations through discovery, \* \* \* jurisdictional discovery is justified and should have been afforded.") (formatting modified); *Second Amendment Found. v. United States Conference of Mayors*, 274 F.3d 521, 525 (D.C. Cir. 2001) ("Certainly a plaintiff faced with a motion to dismiss for lack of personal jurisdiction is entitled to reasonable discovery.") (formatting modified).

Urquhart-Bradley made that showing here. She specifically requested that, if the district court found Mobley's suit-related contacts alleged in the complaint to be lacking, she should be afforded "the opportunity to conduct limited jurisdictional discovery" into Mobley's "contacts with the District of Columbia and his employment at Cushman & Wakefield[.]" J.A. 28 n.3. In particular, she asked for discovery into Mobley's "contacts with [the District of Columbia] through his role in leading the Company's business

activities [there], and his involvement in the discriminatory employment actions taken against * * * Urquhart-Bradley." J.A. 28 n.3. Such information would undoubtedly be of "likely utility" to the minimum contacts analysis, *Natural Resources Def. Council v. Pena*, 147 F.3d 1012, 1024 (D.C. Cir. 1998), as it would flesh out to an even fuller extent Mobley's suit-related contacts with and impact on the forum. As such, once the district court found the current record insufficient to establish personal jurisdiction, it should have granted Urquhart-Bradley's request for limited jurisdictional discovery.

Mobley makes two arguments to defend the district court's *sub silentio* denial of jurisdictional discovery. Neither succeeds.

*First*, Mobley asserts that Urquhart-Bradley simply "does not need to take discovery about Mobley's" contacts with the District of Columbia and his role in her firing because "[s]he worked with Mobley and had been employed by Cushman & Wakefield since 2003." Mobley Br. 31. But Urquhart-Bradley's own work experience hardly establishes that she was privy to any and all relevant information regarding Mobley's professional contacts with the District of Columbia, his interactions with Cushman & Wakefield's office there, or his role in her firing. So Mobley's labeling of her tailored discovery request as a "fishing expedition" is baseless. Mobley Br. 31. Mobley concedes that he oversaw Cushman & Wakefield's District of Columbia office, Mobley Br. 1, and Urquhart-Bradley contends that he played a central role in her firing. She is entitled to drop bait.

*Second*, Mobley argues that the request for jurisdictional discovery "is also essentially moot" because discovery has since proceeded at the district court on Urquhart-Bradley's claims against Cushman & Wakefield. Mobley Br. 31–32. But

that is not how discovery works. Mobley points to nothing showing that the scope of the merits discovery against a different defendant was coextensive with any relevant jurisdictional discovery involving Mobley himself, let alone his contacts with the District of Columbia. Mobley, after all, has not been a defendant throughout the discovery process.

Of course, on remand, with the fiduciary shield doctrine out of the picture, the district court could bypass the jurisdictional discovery issue if it finds that the suit-related contacts plausibly alleged in the complaint already establish specific personal jurisdiction over Mobley. But if the court is unsure, Urquhart-Bradley is entitled to jurisdictional discovery to flesh out the full picture of Mobley's contacts with the District of Columbia.

**IV**

In sum, we vacate the district court's dismissal for lack of personal jurisdiction and remand for it either (i) to determine on the current record that Mobley's individual contacts (made in his capacity as Chief Executive Officer and otherwise) establish specific personal jurisdiction, or (ii) to grant jurisdictional discovery to permit development of the record on Mobley's contacts with the District of Columbia.

*So ordered.*